[No. 64134-4-I.   Division One.   January 3, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. BRUCE HUMMEL, *Appellant*.

750

752

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*David S. McEachran, Prosecuting Attorney*, and *Kimberly A. Thulin, Deputy*, for respondent.

754

¶1 SPEARMAN, J. — A jury convicted Bruce Hummel of the premeditated murder of his wife, Alice. The main issue in this appeal is whether Hummel's statements were properly admitted under the corpus delicti rule. That rule requires the State to produce sufficient evidence to establish the corpus delicti of the charged crime before a defendant's statements may be admitted into evidence. The corpus delicti of a homicide case is proved by evidence, independent of a defendant's statements, establishing the fact of death and a causal connection between the death and a criminal act. We conclude that there was sufficient independent evidence to establish the corpus delicti and that Hummel's statements were properly admitted into evidence. We reject Hummel's contention that the conviction should be reversed and the charge dismissed.

¶2 Hummel's argument that his public trial rights were violated, however, is well taken. The trial court here questioned a number of jurors in chambers without first weighing the factors set forth in *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995). The court did not engage in any meaningful review or balancing of the defendant's right to an impartial jury versus public trial rights. As such, we are constrained by the Supreme Court's opinion in *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) (plurality opinion) to reverse Hummel's convictions and remand for a new trial. We also address additional issues that may arise on remand.

¶3 Reversed and remanded for further proceedings.

## FACTS

¶4 At the time Bruce Hummel's wife, Alice, disappeared in 1990, their youngest daughter, Shanalyn, was 12 years old, and Hummel had been molesting her for years. Hummel forced Shanalyn to help him masturbate. Hummel tried to force Shanalyn to perform oral sex. Hummel would drive to remote areas with Shanalyn to molest her.

¶5 Shanalyn talked with her mother every day. Alice was apparently suspicious about possible molestation because

she twice asked Shanalyn if anything "inappropriate" had happened with Hummel. Shanalyn initially did not disclose the abuse but finally told her mother about the molestation a few days before her birthday. According to Shanalyn, her mother was "upset" at the news of the molestation. Shanalyn believed her mother would take action.

¶6 Just a couple of days after Shanalyn told Alice about the abuse, however, Alice disappeared. On that day, Shanalyn came home from school and only her father was there. Alice had never mentioned to Shanalyn that she was leaving, and Shanalyn did not see her pack any bags. In fact, Alice left behind her personal belongings, including some of her medication, her purse, her wallet, her identification, and her bank cards. Additionally, Alice had made special plans to attend a ballet with Shanalyn for Shanalyn's birthday. Before she vanished, Alice never gave any indication she would miss Shanalyn's birthday or the ballet performance.

¶7 After Alice disappeared, Shanalyn helped Hummel pack her mother's purse, clothes, makeup, medication, and other personal items, allegedly to send to her mother, who Hummel indicated had secured a new job in California. Hummel never sent the items but instead sold them at a garage sale later that year. Likewise, Shanalyn's brother Sean saw Hummel pack a suitcase and boxes with his mother's belongings purportedly to be forwarded. Sean, however, found these boxes and the suitcase hidden in Hummel's basement months later. Hummel told many stories over the years about Alice's location. He initially said Alice had accepted a job in California, but he later claimed she had received a promotion and was working in Texas.

¶8 Shanalyn never saw her mother again. She never received a telephone call from her mother. Shanalyn did receive typewritten letters purportedly from her mother, including one letter saying her mother had met a new man who had no interest in children. But to Shanalyn, those

letters did not read as if they were written by her mother. A forensic scientist who examined the signature on the various pieces of correspondence allegedly sent by Alice after her disappearance testified there were indications the signatures were made by Hummel, not Alice. Additionally, Hummel would throw "temper tantrums" if he caught Shanalyn or Sean attempting to get the mail to see if their mother had sent a letter. After Alice's disappearance, Hummel kept molesting Shanalyn.

¶9 Sean and his mother had a history of leaving notes for each other in a "special place"—in a false ceiling of their basement. Sean checked the false ceiling after his mother disappeared but found nothing. About a year later, however, Sean discovered a "suicide letter" in the space. The letter was in his father's handwriting. Sean once received a Christmas card purportedly from his mother after her disappearance, but the check inside was signed by his dad.

¶10 Sean attempted to find his mother sometime in the early 1990s after purchasing software called "1-800 U.S. Search." None of the "hits" returned by the software were for Alice. Shanalyn also attempted to find her mother using on-line software but was unsuccessful. Hummel and Alice's oldest child, Sharinda, attempted to find Alice after Alice's father died in 1993, but the effort was unsuccessful. Years later Sharinda learned that Hummel had been molesting Shanalyn. Sharinda eventually filed a missing person report for Alice.

¶11 In 2004, Bellingham police and the FBI (Federal Bureau of Investigation) met with Hummel, who had moved to Billings, Montana. The FBI was involved because after Alice disappeared, Hummel immediately began stealing her disability payments. Hummel told law enforcement officers he last saw Alice in October 1990 when he drove her to Sea-Tac airport so she could fly to California for a job interview. Hummel initially denied taking her disability payments but later admitted taking the money. He also admitted molesting Shanalyn starting when she was three years old.

¶12 Hummel pleaded guilty to 12 counts of federal wire fraud for the theft of the disability payments. In his guilty plea, Hummel admitted Alice died on October 18, 1990 and that after she was dead, he falsely represented himself to be Alice for the purpose of collecting her disability payments. Hummel later sent a letter to one of the Bellingham Police Department detectives, apologizing for not telling the truth. In the letter, Hummel again admitted Alice was dead, but he claimed she had committed suicide. The letter was an exceedingly lengthy description of how Hummel purportedly discovered Alice, who he claimed had slit her wrists; how he panicked; how she left a note saying, "[D]on't let the kids know"; and a detailed account of how he disposed of her body the following night by rowing out into Bellingham Bay and dumping her there. In the letter, Hummel claimed it was a stormy night. (The letter was admitted as an exhibit at trial and read by an officer on the stand.)

¶13 The police tested Hummel's former residence for blood and found no traces. They dredged Bellingham Bay but found nothing. Moreover, on the night Hummel claimed to have disposed of the body, Bellingham Bay was calm with no wind, unlike Hummel's description in the letter. The police arrested Hummel. While he was in Whatcom County Jail, he told his cellmate, Donald Cargill, that he had helped his wife Alice "get to a better place" by mixing a handful of ground up pills in apple cider and giving it to Alice to drink.

¶14 The State charged Hummel with first degree murder. Hummel moved to bar the admission of his statements and to dismiss the charge, arguing there was insufficient evidence of the corpus delicti of the crime. The trial court denied both motions. The jury convicted Hummel as charged. At sentencing, the trial court included Hummel's federal wire fraud convictions in his offender score. Hummel appeals.

758

## DISCUSSION

### I. Corpus delicti

¶15  The first issue we must decide is whether the corpus delicti of the crime of homicide was sufficiently established to allow the proper admission of Hummel's statements. It has long been the rule in Washington that such statements cannot be considered by the finder of fact unless the State first establishes the corpus delicti of the crime by independent evidence. *State v. Lung*, 70 Wn.2d 365, 423 P.2d 72 (1967); *State v. Meyer*, 37 Wn.2d 759, 226 P.2d 204 (1951); *State v. Bestolas*, 155 Wash. 212, 215-16, 283 P. 687 (1930). It is also well settled that only two elements are necessary to establish the corpus delicti in a homicide case: the fact of death and a causal connection between the death and a criminal act.[1] *State v. Aten*, 130 Wn.2d 640, 927 P.2d 210 (1996); *Lung*, 70 Wn.2d at 371; *State v. Little*, 57 Wn.2d 516, 521, 358 P.2d 120 (1961); *State v. Richardson*, 197 Wash. 157, 163, 84 P.2d 699 (1938); *State v. Gates*, 28 Wash. 689, 69 P. 385 (1902); *State v. Rooks*, 130 Wn. App. 787, 125 P.3d 192 (2005); *State v. Sellers*, 39 Wn. App. 799, 695 P.2d 1014 (1985). The independent evidence

---

[1] Although we conclude that the independent evidence is sufficient to establish the fact of Alice's death, we note that there is abundant authority that the corpus delicti rule does not apply to statements made in open court. *City of Bremerton v. Corbett*, 106 Wn.2d 569, 575-76, 723 P.2d 1135 (1986) ("The rule requiring independent corroboration of *extrajudicial* confessions and admissions is one of the oldest confession doctrines."); *State v. Marcy*, 189 Wash. 620, 623, 66 P.2d 846 (1937) ("It is a rule that conviction cannot rest upon a confession made *out of court* unless there is independent evidence to establish that the crime has actually been committed by someone." (emphasis added)); *Bestolas*, 155 Wash. at 215 ("[I]t is the better rule that *extrajudicial* confessions or admissions . . . are, in the absence of corroborating testimony . . . insufficient to prove the corpus delicti." (some emphasis added) (italics omitted)); *State v. Thompson*, 73 Wn. App. 654, 658, 870 P.2d 1022 (1994) ("A defendant's *extrajudicial* confession is not admissible at trial unless independent proof establishes the corpus delicti of a crime." (emphasis added)); *State v. Neslund*, 50 Wn. App. 531, 542, 749 P.2d 725 (1988) ("Under the corpus delicti rule, an *extrajudicial* confession or admission may not be considered by the trier of fact unless independent proof prima facie establishes the corpus delicti of the crime." (emphasis added)). Thus, Hummel's admissions in his statement of plea of guilty in federal court that Alice was deceased is more than sufficient to satisfy the "fact of death" element of the corpus delicti.

may be either direct or circumstantial and need not be of such character as would establish the corpus delicti beyond a reasonable doubt or even by a preponderance of the evidence. *Aten*, 130 Wn.2d at 656. It is sufficient if it prima facie establishes the corpus delicti. *Id.* "Prima facie" in the context of the corpus delicti rule means " 'evidence of sufficient circumstances which would support a logical and reasonable inference' of the facts sought to be proved." *Id.* at 656 (quoting *State v. Vangerpen*, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995)). There is no requirement that the evidence establish the identity of the perpetrator. *Lung*, 70 Wn.2d at 371. In analyzing whether there is sufficient evidence to support the corpus delicti of the crime, this court "assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State." *Aten*, 130 Wn.2d at 658. The causal connection between the death and the defendant's acts cannot be based on mere conjecture and speculation. *Id.* at 661 (quoting *Little*, 57 Wn.2d at 521).

¶16 Here, the evidence independent of Hummel's statements can be summarized as follows:

- At the time Hummel's wife Alice disappeared, their youngest daughter, Shanalyn, was 12 years old, and Hummel had been molesting her for years.
- Hummel and Alice would bicker "constantly."
- Shanalyn talked with her mother every day. Her mother twice asked if anything "inappropriate" had happened with Hummel.
- Shanalyn told her mother about the molestation a few days before her birthday.
- Alice was "upset" at the news of the molestation. Shanalyn believed her mother would take action.
- Just a couple of days after Shanalyn told her mother about the abuse, her mother disappeared.
- Shanalyn came home from school and only her father was there when she arrived home.

- Alice never mentioned leaving to Shanalyn, and Shanalyn did not see her pack any bags.

- Alice left behind her personal belongings, including medication, purse, wallet, identification, and bank cards.

- At the time she disappeared, Alice was working on a computer project for Wayne Terry. She never completed it or spoke to Terry about abandoning the work. This was contrary to her previous work for Terry, which had always been completed on a timely basis.

- Alice had made special plans to attend a ballet with Shanalyn for Shanalyn's birthday and never gave any indication she could not make it.

- Shanalyn helped Hummel pack her mother's purse, clothes, makeup, medication, and other personal items, allegedly to send to her mother, who had secured a new job in California. Hummel never sent the items, however, but instead sold them at a garage sale later that year.

- Shanalyn never saw her mother again. She never received a telephone call from her mother.

- Shanalyn did receive typewritten letters purportedly from her mother, including one letter saying her mother had met a new man who had no interest in children. But those letters did not read as if they were written by her mother.

- A forensic scientist who examined the signature on the various pieces of correspondence allegedly sent by Alice after her disappearance testified there were indications the signatures were made by Hummel, not Alice.

- Hummel would throw "temper tantrums" if he caught Shanalyn and her brother attempting to get the mail to see if their mother had sent a letter.

- Sean Hummel and his mother had a history of leaving notes for each other in a "special place"—in a false ceiling of their basement. Sean checked the false ceiling after his mother disappeared but found nothing. About a year later, however, Sean discovered a "suicide letter" in the space. The letter was in his father's handwriting.

- Sean Hummel once received a Christmas card purportedly from his mother after her disappearance, but the check inside was signed by his dad.

- After Alice's disappearance, Hummel kept molesting Shanalyn.

- After Alice disappeared, Hummel immediately began stealing her disability payments. Ex. 6 (U.S. District Court of Alaska plea agreement). Hummel pleaded guilty to 12 counts of federal wire fraud for the theft of the disability payments.

¶17 Relying on *Aten*; *State v. Dow*, 168 Wn.2d 243, 227 P.3d 1278 (2010); and *State v. Brockob*, 159 Wn.2d 311, 150 P.3d 59 (2006), Hummel argues that this evidence is insufficient to establish the corpus delicti for first degree murder. Hummel contends that these cases stand for the proposition that if the independent evidence supports hypotheses of both guilt and innocence, it is insufficient to satisfy the corpus delicti rule and further that the independent evidence must prove every element of the crime charged, including the requisite mental state. Hummel contends that here, since Alice's body was never found, the independent evidence does not eliminate the possibility that she simply left or died of natural causes.[2] He further argues that even assuming that Alice is deceased, the independent evidence does not establish every element of the charged crime, specifically, that her death was caused

---

[2] Hummel cites to testimony by their son, Sean Hummel, that he was aware that Alice had talked to people about a job in California, had health problems, and took a number of medications.

by a person with the requisite mental state for first degree murder, premeditated intent. Hummel misconstrues these cases and ignores the decades of case law explaining the application of the corpus delicti rule in homicide cases in the state of Washington. We reject his arguments and affirm the trial court's ruling that the corpus delicti was sufficiently established by the independent evidence and that Hummel's statements were admissible.

¶18 In *Aten*, the case upon which Hummel principally relies, the defendant confessed to killing an infant by manually suffocating the baby and was charged with second degree manslaughter, i.e., causing the death with criminal negligence. The fact of death was not in dispute. The issue was whether the evidence was sufficient to establish a causal connection between the death and a criminal act. The court posed the question as whether the independent evidence supported "a reasonable and logical inference that Respondent acted in a manner which showed lack of awareness of a substantial risk that a wrongful act might occur and that lack of awareness constituted a gross deviation from reasonable care which resulted in the death of the infant . . . ." *Aten*, 130 Wn.2d at 658.

¶19 The court noted the medical examiner's testimony that the infant died of acute respiratory failure and that he could not determine whether the respiratory failure was caused by Sudden Infant Death Syndrome (SIDS) or suffocation. The medical examiner also testified that he concluded the infant died from SIDS and described the similarity in the infant's death to a typical SIDS case. "Based upon the autopsy findings alone, [the medical examiner] could not reasonably and logically infer [the infant] died as a result of a criminal act." *Id.* at 659. The court concluded that "[t]he totality of independent evidence in this case does not lead to the conclusion there is a 'reasonable and logical' inference that the infant . . . died as a result of criminal negligence and that that inference is not the result of 'mere conjecture and speculation.' " *Id.* at 661.

¶20 Hummel claims that because the *Aten* court identified the specific intent necessary to prove criminal negligence, it thereby modified the corpus delicti rule to include proof of each element of the crime, including the requisite mental state. But nowhere in *Aten* is it suggested that proof of each element of the crime was necessary to establish the corpus delicti. Although the mental state required to prove second degree manslaughter was raised, there was no discussion in *Aten* of how the independent evidence did or did not satisfy that particular mental state. Instead, the court addressed only whether the evidence supported a reasonable and logical inference that the infant died as a result of a criminal act. Moreover, Hummel cites no other case, nor could we find any, holding that evidence of the mental state applicable to a specific degree of the alleged crime is necessary to establish that the death was the result of a criminal act.[3]

¶21 Hummel contends that *Dow* provides support for this claim, but his reliance on that case is misplaced. In *Dow*, the Supreme Court discussed the judicially created corpus delicti rule, but the case actually turned on the applicability of RCW 10.58.035. Mr. Dow was charged with first degree child molestation. *Dow*, 168 Wn.2d at 247. The victim was a three-year-old child, and the State acknowledged she was too young to testify. *Id.* Dow and the child were the only people present at the time of the alleged offense, and the State conceded there was no evidence independent of Dow's statements to the police that the crime occurred. *Id.* The State nevertheless argued that Dow's statements were trustworthy and should be admitted under RCW 10.58.035. *Id.* at 254. That statute allowed a defendant's statements into evidence even where independent evidence of the crime was absent, so long as certain

---

[3] Indeed, in *State v. Mason*, 31 Wn. App. 41, 48, 639 P.2d 800 (1982), where the defendant was convicted of first degree assault, we held, "The mental element of the felony charged need not be proved by independent evidence prior to trial use of a defendant's confession when that element of the crime charged provides merely the degree of the generic crime charged." (Emphasis omitted.)

statutory indications of trustworthiness of the statements were present.[4]

¶22 The trial court declined to admit the statements and dismissed the case. The Supreme Court affirmed dismissal, holding that even if Dow's statements were trustworthy and should have been admitted, RCW 10.58.035 pertained "only to admissibility" and did not relieve the State of the burden of presenting sufficient evidence independent of a defendant's confession to support a conviction. *Id.* at 253-54. Given the State conceded there was no corroborating evidence independent of Dow's statements, the court held the corpus delicti was not satisfied.

¶23 In reaching this conclusion, the Supreme Court also stated, "[T]he State must still prove every element of the crime charged by evidence independent of the defendant's statement." *Id.* at 254. Hummel relies on this statement to argue that instead of having to prove by independent evidence a causal connection between the death and a criminal act, the State must now prove every element of the charged crime. But again, Hummel takes this statement out of context. First, the sentence was entirely unnecessary to resolve *Dow*. It was undisputed that there was no evidence, other than the defendant's statements, to establish that the charged crime had been committed. Thus, the court had no

---

[4] The statute provided in relevant part, "[W]here independent proof of the corpus delicti is absent, and the alleged victim of the crime is dead or incompetent to testify, a lawfully obtained and otherwise admissible . . . statement of the defendant shall be admissible into evidence if there is substantial independent evidence that would tend to establish the trustworthiness of the . . . statement of the defendant." RCW 10.58.035(1).

The legislature provided a nonexclusive list of factors to consider in determining trustworthiness:

(a) Whether there is any evidence corroborating or contradicting the facts set out in the statement, including the elements of the offense;
(b) The character of the witness reporting the statement and the number of witnesses to the statement;
(c) Whether a record of the statement was made and the timing of the making of the record in relation to the making of the statement; and/or
(d) The relationship between the witness and the defendant.

RCW 10.58.035(2).

reason to analyze or elaborate on the quantum of proof necessary to establish the corpus delicti because there was none, and the court's statement on this issue was "wholly incidental" to the decision. Statements made in the course of the Supreme Court's reasoning that are "wholly incidental" to the basic decision constitute dicta and do not bind us. *See Burress v. Richens*, 3 Wn. App. 63, 66, 472 P.2d 396 (1970).

¶24 Second, if the cited statement is to be taken at face value, as is urged by Hummel, it directly contradicts, without explicitly overruling or distinguishing, decades of Supreme Court and Court of Appeals decisions holding that proof of identity, while a necessary element to be proved at trial, need not be proved to establish the corpus delicti of the charged crime.[5] Moreover, neither Hummel nor the *Dow*

---

[5] *See, e.g., State v. Gates*, 28 Wash. 689, 695, 69 P. 385 (1902) (in manslaughter case, corpus delicti requires only " 'the existence of a certain act or result forming the basis of the criminal charge; and . . . the existence of criminal agency as the cause of this act or result' " (quoting 1 AM. & ENG. ENC. LAW 861 (2d ed. 1898))); *State v. Richardson*, 197 Wash. 157, 163, 84 P.2d 699 (1938) (in first degree murder case, corpus delicti requires only existence of act forming basis of criminal charge and criminal agency); *State v. Fry*, 39 Wn.2d 8, 11-13, 16, 234 P.2d 531 (1951) (in manslaughter case, corpus delicti satisfied by circumstantial evidence of fact of death and testimony connecting defendant to the crime); *Little*, 57 Wn.2d at 521 (in second degree murder case, corpus delicti requires only two elements: "[t]he fact of death, and . . . a causal connection between the death and the criminal conduct of the accused"); *State v. Thompson*, 58 Wn.2d 598, 604, 364 P.2d 527 (1961) (in second degree murder case, "[p]roof of *corpus delicti* is proof that a crime has been committed"); *Lung*, 70 Wn.2d at 371 (in second degree homicide case, corpus delicti requires only "fact of death and . . . a causal connection between the death and a criminal agency, but the corpus delicti does not require proof of a causal relation between the death and the accused"); *State v. Fagundes*, 26 Wn. App. 477, 484, 614 P.2d 198 (1980) (in first degree felony murder, first degree rape, first degree kidnapping, and first degree theft case, corpus delicti satisfied where "the facts established support a logical and reasonable deduction that the crimes had, in fact, been committed"); *Mason*, 31 Wn. App. at 47-48 (in first degree assault case, this court specifically rejected the idea that corpus delicti requires all independent proof of all elements such as mens rea: "defendant's argument is that all the material elements of the statutory offense are necessary to establish the corpus delicti. We disagree and decline to impose such a rule"); *State v. Sellers*, 39 Wn. App. 799, 802, 695 P.2d 1014 (1985) (in second degree murder case where no body was found, corpus delicti required only "the fact of death, and . . . the responsibility of a criminal agency for the death"); *State v. Quillin*, 49 Wn. App. 155, 162, 741 P.2d 589 (1987) (in first degree felony murder case, corpus delicti requires proof of only "fact of death, and . . . the responsibility of a criminal agency

court cite to any case holding that every element of the charged crime need be proved to establish the corpus delicti. Although the statement upon which Hummel relies was followed by a citation to *Brockob*, as noted in the citation itself, that case held only that "[a] defendant's incriminating statement alone is not sufficient to establish that a crime took place." *Brockob*, 159 Wn.2d at 328 (footnote omitted) (citing *Aten*, 130 Wn.2d at 655-56). Moreover, the *Brockob* court explicitly stated, "The independent evidence need not be sufficient to support a conviction, but it must provide prima facie corroboration of the crime described in a defendant's incriminating statement." *Id.* (emphasis omitted). Nowhere in *Brockob* did the court indicate that the State was required to prove every element of the charged crime to establish the corpus delicti.

¶25 We thus reject Hummel's argument that the corpus delicti rule has been modified and adhere to the view that the evidence is sufficient to establish the corpus delicti in a homicide case if it leads to a reasonable and logical inference of death and a causal connection between the death and a criminal act.

¶26 Hummel also cites *Aten* and *Brockob* to argue that the independent evidence is insufficient to establish the corpus delicti unless it also "prove[s] the nonexistence of any reasonable hypothesis of innocence." Because the source of this proposition is *Lung* (*see Aten*, 130 Wn.2d at 660 (quoting *Lung*, 70 Wn.2d at 371)), a review of that case is instructive. *Lung* was similar to this case because it involved a murder prosecution where the victim's body was never recovered. When the victim, Lung's estranged wife,

---

for the death," and moreover, "[a] causal connection between the defendant and crime is not required"); *Aten*, 130 Wn.2d at 655 (in a homicide case, corpus delicti consists of only two elements: "(1) the fact of death and (2) a causal connection between the death and a criminal act"); *State v. Bernal*, 109 Wn. App. 150, 152, 33 P.3d 1106 (2001) (in controlled substances homicide case, "the corpus delicti rule requires that the State produce evidence, *independent of the accused's statements*, sufficient to support a finding that the charged crime was committed by someone"); *Rooks*, 130 Wn. App. at 802 (in second degree murder case, corpus delicti required only "the fact of death and . . . a causal connection between the death and a criminal act").

suddenly disappeared, Lung was questioned by the police. He provided a statement in which he claimed a loaded rifle in his closet accidentally discharged when he reached into the closet for his jacket. The victim was standing nearby and was killed by the single shot. According to Lung, he panicked, put her body in his truck, drove to the river, and threw her body into it. *Lung*, 70 Wn.2d at 367. After disposing of the body, he returned the gun to his business where he normally kept it. Police later discovered it there, with a live round in the chamber. Lung claimed he put the victim's coat, purse, and shoes back in her car. *Id.* at 368.

¶27 Lung's statements were admitted against him at trial. Other evidence corroborated portions of the statements. An expert testified that the hole in the victim's coat was made by a bullet from the defendant's rifle. *Id.* Blood found in Lung's house confirmed the location where the victim was standing when she was shot. Her watch and ring were on the windowsill where the defendant said she had placed them before the shooting. *Id.* at 368-69. An officer on patrol testified to seeing the defendant's truck on the road to the location on the river where he said he dumped the body. *Id.* at 369. The jury convicted the defendant of second degree murder.

¶28 On appeal, the defendant contended that the trial court erred in admitting his statement because without the body, there was no independent evidence proving the fact of death. *Id.* at 371. But the court held that the evidence was sufficient to establish the corpus delicti. The court held:

> The difficulty in the case at bar is the fact that the body of the victim was never found. Is the body or some part thereof required to establish the "fact of death" element in the corpus delicti? We think not. To require direct proof of the killing or the production of the body of the alleged victim in all cases of homicide would be manifestly unreasonable and would lead to absurdity and injustice.
>
> The final test is whether the facts found and the reasonable inferences from them have proved the nonexistence of any

reasonable hypothesis of innocence. All that is required to prove death is circumstantial evidence sufficient to convince the minds of reasonable men of the existence of that fact. The law employs the judgment of reasonable minds as the only means of arriving at the truth by inference from the facts and circumstances in evidence. If this were not true, an infinite number of crimes involving the elements of a specific intent would go unpunished.

*Id.* at 371.

¶29 Hummel seizes on the court's statement that the independent evidence of the corpus delicti must prove "the nonexistence of any reasonable hypothesis of innocence," but when viewed in context, the court clearly holds that even without the body, where the independent circumstantial evidence is sufficient to convince reasonable minds of the fact of death and of the causal connection between the death and a criminal act, the corpus delicti is satisfied and the accused's statements are admissible.[6]

¶30 As we explained in *Rooks*, 130 Wn. App. 787, the result in *Aten* is entirely consistent with this understanding of *Lung*. In *Rooks*, the defendant was convicted of second degree murder for the killing of his ex-girlfriend and

---

[6] The statement in *Lung*, later cited by the *Aten* court, that "the facts found and the reasonable inferences from them have proved the nonexistence of any reasonable hypothesis of innocence," *Lung*, 70 Wn.2d at 371, was unrelated to the application of the corpus delicti rule, but instead was related to how circumstantial evidence was weighed in 1967 when *Lung* was decided. That rule that was abrogated by our Supreme Court in 1975, as courts around the country came to realize that some circumstantial evidence was not necessarily less reliable than some "direct" evidence, e.g., eyewitness identification. *State v. Gosby*, 85 Wn.2d 758, 762-66, 539 P.2d 680 (1975) (abrogating rule requiring the jury to be instructed that "to sustain a conviction on circumstantial evidence alone, the circumstances proved by the State must not only be consistent with each other and consistent with the hypothesis that the accused is guilty, but also must be inconsistent with any reasonable hypothesis or theory which would establish, or tend to establish, his innocence"). It would be anomalous that this rule would be abandoned when considering whether the reasonable doubt standard has been met but adhered to in determining whether prima facie the corpus delicti has been established. The statement in *Aten* that proof of the corpus delicti must be inconsistent with innocence was both dictum and a misreading of a long-abandoned evidentiary and jury instruction standard that was unrelated to the corpus delicti rule.

mother of his child. The deceased's body was found some months after her disappearance and was in an advanced state of decomposition. Rooks had made statements to a friend and to the police that he had strangled his ex-girlfriend. The medical examiner was unable to determine the manner and cause of death but could not rule out homicide by strangulation and, because of evidence that the deceased had ingested cocaine within a few days of her death, could also not rule out a drug overdose. The State introduced evidence about the deceased's sudden disappearance, about a custody dispute between the deceased and Rooks, and that Rooks had abused the deceased physically and psychologically throughout their relationship. There was also evidence that the deceased had a history of drug use, including cocaine. The trial court denied Rooks' motion to exclude his statements based on the corpus delicti rule. On appeal, Rooks, like Hummel, relied on *Aten* to argue that because the independent evidence did not prove " 'the nonexistence of any reasonable hypothesis of innocence,' " the corpus delicti was not established. *Id.* at 803 (quoting *Aten*, 130 Wn.2d at 660).

¶31 We rejected Rooks' argument, explaining that Rooks misconstrued the holding in *Aten*.

> Rooks assumes the court in *Aten* concluded the corpus delicti was not established because there was more than one logical and reasonable explanation for the death. But *Aten* clearly states there was no reasonable inference of criminal conduct in that case. Because the court concluded there was no reasonable and logical inference that the infant died as a result of criminal negligence, *Aten* does not hold that the corpus delicti cannot be established where there are reasonable and logical inferences of both criminal and noncriminal causes of death.

*Id.* at 803-04 (citation omitted) (citing *Aten*, 130 Wn.2d at 661). We further explained that the corpus delicti is satisfied where the totality of the independent evidence supports a reasonable and logical inference that there was a death and a causal connection between the death and a

criminal act. We concluded that the independent evidence in *Rooks* met that test. *Id.*

¶32 Likewise, in this case, when the evidence is viewed in a light most favorable to the State and all reasonable inferences are construed in favor of the State, it leads to a reasonable and logical conclusion that Alice is deceased and that her death was a result of a criminal agency. The evidence that Alice vanished suddenly and surprisingly, never to be heard from again; that she was close with her children and was unlikely to simply abandon them; that, without explanation, she failed to attend a special event for her daughter's birthday; and that the failure to complete a work assignment was out of character leads to a reasonable and logical inference that she is deceased. The evidence that her daughter revealed Hummel's molestation just days before Alice's disappearance, that Hummel continued to molest his daughter after his wife vanished, that he lied to his children about Alice's belongings and whereabouts, that he forged Alice's signature on documents, and that he stole Alice's pension immediately after she vanished leads to a logical and reasonable inference that Alice is dead and that her death is the result of a criminal agency on the part of Hummel. *Lung*, 70 Wn.2d at 371.[7] We reject Hummel's arguments on this issue and decline to dismiss the case with prejudice.

## II. *Public Trial Right*

¶33 Hummel also argues the trial court violated his right to a public trial by questioning a number of jurors in chambers without first weighing the factors set forth in *Bone-Club*, 128 Wn.2d 254. *See Strode*, 167 Wn.2d 222;

---

[7] This evidence is analogous to that presented in *Thompson*, 73 Wn. App. 654, a first degree murder case, where this court concluded the corpus delicti was established even though the victim's body was never found. *See id.* at 663 (relying on the victim's habits regarding housework, patterns of contact with her friends, and care of her pets, as well as evidence that she disappeared suddenly and without warning, as creating a strong inference that she died and her death was sudden and caused by criminal means).

*State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009) (*Bone-Club* factors must be weighed before courtroom closure). We agree, and therefore reverse and remand for retrial.

¶34 Article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to a public trial. Article I, section 10 of the Washington Constitution provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." This provision guarantees the public and the press the right to open and accessible judicial proceedings. *State v. Easterling*, 157 Wn.2d 167, 174, 137 P.3d 825 (2006). After the court weighs the *Bone-Club* factors, it must enter specific findings justifying its closure order. *Id.* at 175.

¶35 Not all in-chambers conferences implicate the right to a public trial, however. Public trial rights apply only in " 'adversary proceedings,' including presentation of evidence, suppression hearings, and jury selection." *In re Det. of Ticeson*, 159 Wn. App. 374, 384, 246 P.3d 550 (2011) (quoting *State v. Koss*, 158 Wn. App. 8, 16, 241 P.3d 415 (2010), *petition for review filed*, No. 85306-1 (Wash. Nov. 16, 2010)). Importantly, the right does not attach where the court resolves " 'purely ministerial or legal issues that do not require the resolution of disputed facts' . . . ." *Id.* (internal quotation marks omitted) (quoting *Koss*, 158 Wn. App. at 17).

¶36 The State contends this case is analogous to *Momah*, where the Supreme Court held the failure to conduct a *Bone-Club* analysis did not warrant reversal. *Momah* involved a heavily publicized trial that received extended media coverage. *Momah*, 167 Wn.2d at 145. Before trial, the trial judge, prosecutor, and defense attorney discussed which of the more than 100 jurors would be individually questioned. *Id.* at 146. The defense attorney argued for the expansion of in-chambers questioning, stating:

"[I]t is our position and our hope that the Court will take everybody individually, besides those . . . we have identified . . . . Our concern is this: They may have prior knowledge to the extent that they might disqualify themselves, or we have the real concern that they will contaminate the rest of the jury."

*Id.* After admonishing the jury pool not to talk about the case, the court moved to chambers to begin individually questioning jurors. Momah's attorney actively participated in the process, questioned jurors, and exercised numerous for cause challenges. *Id.* at 146-47. At all times, counsel and the trial court in the *Momah* case were keenly aware of and sought to protect the requirement that the trial be public. *See Strode*, 167 Wn.2d at 233 (Fairhurst, J., concurring).

¶37 In the early closure cases, trial courts were often reversed for closing the courtroom "without seeking objection, input, or assent from the defendant; and in the majority of cases, the record lacked any hint that the trial court considered the defendant's right to a public trial when it closed the courtroom." *Momah*, 167 Wn.2d at 151. But the facts of *Momah* set it apart from earlier closure case law:

Momah affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in it, and benefited from it. Moreover, the trial judge in this case not only sought input from the defendant but he also closed the courtroom after consultation with the defense and the prosecution. Finally, and perhaps most importantly, the trial judge closed the courtroom to safeguard Momah's constitutional right to a fair trial by an impartial jury.

*Id.* at 151-52. The majority thus held that although the procedure set forth in *Bone-Club* is the better practice, closure had nevertheless occurred to protect Momah's rights. *Id.* at 155. As such, the court held Momah suffered no actual prejudice and reversal was not warranted. *Id.* at 156.

¶38 Hummel argues his case is more like *Strode*, a plurality decision issued the same day as *Momah*. In *Strode*,

the trial court sua sponte conducted in-chambers questioning of 11 prospective jurors. The prosecution and defense counsel participated in this questioning. Four justices in the lead opinion wrote that Strode's conviction must be reversed because "the record is devoid of any showing that the trial court engaged in the detailed review that is required in order to protect the public trial right." *Strode*, 167 Wn.2d at 228. On this point, the concurrence agreed: "Unlike the situation presented in *Momah*, here the record does not show that the court considered the right to a public trial in light of competing interests." *Id.* at 235 (Fairhurst, J., concurring).

¶39 We agree with Hummel and conclude this case is more like *Strode*. Here, Hummel proposed and the court adopted a juror questionnaire that permitted prospective jurors to inform counsel and the trial court if the juror "would prefer to discuss your answer in private." The court explained how this procedure would work to counsel and the venire, and then moved forward with questioning individual jurors in chambers without conducting a *Bone-Club* analysis:

> If the Court chooses, we may, if there's no one in objection, have those jurors who have answered questions that way, join myself, the attorneys, and the defendant in chambers along with the court reporter to inquire about those particular areas in private, just as to those questions that the potential juror members have marked as something that they would like to answer in private.
>
> Is there anyone in this courtroom who has any objection whatsoever to us following that procedure for those jurors? And there are nine jurors who have so indicated. Anyone who has any objection whatsoever to that?
>
> Seeing no objection, we're going to take a few moments and do that. I'm going to ask the bailiff to bring those jurors in one at a time in order of their numbers.
>
> We'll inquire very briefly of those few questions in the jury room, and as soon as we've completed that, we'll come back and begin the more general voir dire with the rest of the group.

. . . .

We'll take a short recess to chambers then, and the court reporter will join us along with the Defendant and counsel.

(The following proceedings occurred in chambers. Juror Number 5 entered chambers.)

Although the trial court did ask in open court whether "anyone" objected to the closure, the court did not engage in any meaningful review or balancing of the defendant's right to an impartial jury versus public trial rights. In other words, as was the case in *Strode*, "the record is devoid of any showing that the trial court engaged in the detailed review that is required in order to protect the public trial right." *Id.* at 228.

¶40 In *Strode* the court held that " '[t]he denial of the constitutional right to a public trial is one of the limited classes of fundamental rights not subject to harmless error analysis.' " *Id.* at 231 (alteration in original) (quoting *Easterling*, 157 Wn.2d at 181). This was because "denial of the public trial right is deemed to be a structural error and prejudice is necessarily presumed." *Id.* (citing *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)). For that reason, the court held the error "cannot be considered harmless and, therefore, Strode's convictions are reversed and the case is remanded for a new trial." *Id.* As such, we are required under *Strode* to reverse Hummel's convictions and remand for a new trial.

### III. *Confrontation Clause*

¶41 Hummel next contends he was denied his Sixth Amendment right to confront witnesses against him when several of the State's witnesses discussed how they unsuccessfully attempted to use database search engines to locate Alice Hummel. Because this, and the other issues discussed below, may arise again on remand, we address them here.

¶42 Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

confronted with witnesses against him." " '[T]he "principal evil" at which the clause was directed was the civil-law system's use of ex parte examinations and ex parte affidavits as substitutes for live witnesses in criminal cases.' " *State v. Jasper*, 158 Wn. App. 518, 526, 245 P.3d 228 (2010) (quoting *State v. Lui*, 153 Wn. App. 304, 314, 221 P.3d 948 (2009), *review granted*, 168 Wn.2d 1018, 228 P.3d 17 (2010) (quoting *Crawford v. Washington*, 541 U.S. 36, 50, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004))), *review granted*, 170 Wn.2d 1025 (2011). Not every out-of-court statement used at trial implicates the core concerns of the confrontation clause, however. As we explained in *Jasper*, the confrontation clause is implicated only by a witness who is bearing testimony:

> [T]he scope of the clause is limited to "witnesses" against the accused—in other words, those who "bear testimony." "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."

*Id.* (second alteration in original) (quoting *Crawford*, 541 U.S. at 51). The United States Supreme Court listed three possible formulations for the "core class" of testimonial statements covered by the confrontation clause:

> "[(1)] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [(2)] extrajudicial statement . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [(3)] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Jasper*, 158 Wn. App. at 527 (most alterations in original) (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 51-52).

¶43 Hummel argues computer searches conducted by his children and two other witnesses for the State for the

purpose of attempting to locate Alice Hummel amount to testimonial statements covered by the confrontation clause. Hummel relies largely on *Crawford, Jasper, Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and *United States v. Martinez-Rios*, 595 F.3d 581 (5th Cir. 2010). We disagree.

¶44 In *Crawford*, the testimony at issue was a tape recorded statement of the defendant's wife, taken by the police. According to the United States Supreme Court, "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Crawford*, 541 U.S. at 52. At issue in *Jasper* was admission of sworn testimony from the Department of Licensing, an affidavit that "contain[ed] ex parte statements made for the purpose of establishing the fact that Jasper was driving with a suspended license on the day of the collision." *Jasper*, 158 Wn. App. at 531. Similarly, in *Melendez-Diaz*, the trial court admitted sworn testimony from analysts at the Massachusetts State Laboratory Institute certifying the substance seized from the defendant was cocaine. Nobody from the lab appeared to testify. *Melendez-Diaz*, 557 U.S. at 308-09. Likewise, in *Martinez-Rios*, the defendant was convicted of illegally reentering the United States. To secure the conviction, the prosecution sought, and the District Court admitted, a "Certificate of Nonexistence of Record" from a records analyst declaring that after a diligent search was performed, a field office director with the United States Citizenship and Immigration Services could find no record that the defendant had obtained consent to reenter the country. This analyst never testified at trial. *Martinez-Rios*, 595 F.3d at 583-84.

¶45 No such evidence was ever introduced here. There were no certificates, affidavits, declarations, or other such testimony from third parties that did not participate in Hummel's trial and were not subject to cross-examination. Indeed, all of the evidence about which Hummel complains came from live testimony at trial that was

subject to cross-examination by Hummel. To the extent Hummel takes issue with the reliability of the computer searches to which several witnesses testified, that subject was fully available for Hummel to explore on cross-examination, or perhaps move in limine to exclude as not scientifically valid. It is not, however, a confrontation issue, and as such, Hummel was not denied his Sixth Amendment right to confront witnesses. We reject his arguments on this issue.

IV. *Proposed Prison Informant Testimony Instruction*

¶46 Hummel also claims the trial court erred by declining to give an instruction informing the jury about the inherent untrustworthiness of prison informant testimony. A trial court's refusal to give a proposed instruction is reviewed on appeal for an abuse of discretion. *State v. Picard*, 90 Wn. App. 890, 954 P.2d 336 (1998). A trial court abuses its discretion if its decision is manifestly unreasonable or is based on untenable grounds or for untenable reasons. *In re Det. of Duncan*, 167 Wn.2d 398, 402, 219 P.3d 666 (2009). Instructions are adequate if they allow a party to argue its theory of the case and do not mislead the jury or misstate the law. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

¶47 Hummel proposed several versions of an instruction regarding the prison informant who testified against him, all of which were rejected by the trial court. Hummel relies largely on federal and out-of-state case law to argue his right to a fair trial was violated when the trial court declined to give one of his instructions. He acknowledges there is no Washington case requiring the jury be instructed as to the inherent untrustworthiness of jailhouse informant testimony. He asks us, however, to treat jailhouse informant testimony in the same fashion that accomplice testimony is treated. Hummel is correct that Washington courts recognize an informant "may have an interest in testifying against the defendant." *State v. Larson*, 160 Wn.

App. 577, 588, 249 P.3d 669, *review denied*, 172 Wn.2d 1002, 257 P.3d 666 (2011). In the context of an accomplice, trial courts "must" give the pattern jury instruction "whenever there is uncorroborated accomplice testimony." *Id.* (citing 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.05, at 184 (3d ed. 2008)). But here, the jailhouse informant was not an accomplice, and as such, the instruction regarding uncorroborated accomplice testimony is not mandatory, as was the case in *Larson*.

¶48 In our view, *State v. Allen*, 161 Wn. App. 727, 255 P.3d 784, *review granted*, 172 Wn.2d 1014, 161 P.3d 63 (2011), is dispositive on this issue. In that case, the defendant argued he was denied the right to a fair trial when the trial court declined to instruct the jury on the untrustworthiness of cross racial eyewitness testimony. *Id.* at 734. We acknowledged the abundance of authority showing that identifications when an eyewitness of one race is asked to identify a particular individual of another race are particularly problematic. *Id.* at 735, 756-57 (Ellington, J., concurring) ("modern research establishes that cross-racial identification of strangers is much less reliable than same-race identifications"). We nevertheless affirmed on grounds the Supreme Court, in *State v. Laureano*, 101 Wn.2d 745, 768, 682 P.2d 889 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 132-33, 761 P.2d 588 (1988), had already held it was not error to decline to provide such an instruction. *Allen*, 161 Wn. App. at 739, 745. Additionally, although we were sympathetic to the argument that juries often do not understand that cross racial identifications can be untrustworthy, we also declined to diverge from the line of cases indicating such instructions can in some cases run afoul of our state constitution's prohibition on comments on the evidence. *Id.* at 475 ("We also follow our prior cases holding that an instruction about the reliability of eyewitness evidence risks violating the constitutional prohibition against comments on the evidence.").

¶49 Hummel's proposed instructions here are similar to those proposed in *Allen*. We adhere to *Allen* and hold the

trial court did not abuse its discretion in declining to give the instructions.

## V. *Offender Score*

¶50 Hummel argues the trial court erroneously included his federal convictions for wire fraud when calculating his offender score. We agree. The law in effect at the time the offense was committed controls the punishment available for the offense. RCW 9.94A.345; *State v. Varga*, 151 Wn.2d 179, 191, 86 P.3d 139 (2004). The State charged Hummel with committing first degree murder in October 1990. Clerk's Papers at 50, 498. In 1990, out-of-state convictions could be included in an offender score only if they were comparable to a Washington felony. *See* former RCW 9.94A.360(3) (1990). At the time, the statute did not address federal convictions, but this court construed out-of-state convictions to include those from federal courts. *State v. Villegas*, 72 Wn. App. 34, 37, 863 P.2d 560 (1993). In a comparability analysis, the elements of a foreign conviction must be comparable. *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005).

¶51 Hummel contends the elements of his federal wire fraud convictions were not comparable to any Washington crime, and he correctly notes that the trial court failed to undertake any comparability analysis. The State essentially concedes error but argues Hummel waived the issue by not raising comparability at sentencing. Specifically, the State contends that under "former RCW 9.94A.530(2) (2008)," Hummel's silence regarding comparability must be construed as "acknowledgement." We disagree. The State is relying on a 2008 statute, even though it previously acknowledged the law as it was in 1990 applies.

¶52 In 1990, former RCW 9.94A.360(2) provided that in "determining any sentence, the trial court may rely on no more information than is . . . admitted, acknowledged, or proved in a trial or at the time of sentencing." Although the 2008 version of the statute now further defines "acknowl-

edgement" as "not objecting to criminal history presented at the time of sentencing," RCW 9.94A.530(2), that definition was not present in the 1990 version of the statute and cannot be applied in Hummel's case. Moreover, the Supreme Court rejected the State's interpretation of "acknowledge" in *State v. Ford*, 137 Wn.2d 472, 483, 973 P.2d 452 (1999), where it held that "a defendant does not 'acknowledge' the State's position regarding classification absent an affirmative agreement beyond merely failing to object."

¶53 In short, the trial court erred in including Hummel's wire fraud convictions in his offender score. Should Hummel be again convicted on remand, his wire fraud conviction cannot be used in calculating his offender score.

## VI. *Statement of Additional Grounds*

¶54 Hummel raises several issues in his statement of additional grounds, none of which have merit. Hummel first takes issue with his son's testimony that the suicide note his son found appeared to be in Hummel's handwriting. According to Hummel, since the letter no longer exists, it cannot be analyzed by handwriting experts and his son's testimony is therefore faulty. But this goes to the weight of his son's testimony, not to its admissibility.

¶55 Likewise, Hummel believes the handwriting expert relied upon faulty samples of his handwriting to formulate her opinion that he actually wrote the letters and cards sent to the children in Alice's name. Again, this goes to the weight of the evidence, not to its admissibility. Hummel also explains why he believes Alice would not show up on a search of computer records: that Alice was working at a company only on a temporary basis. This also appears to be challenging the weight to be given to the testimony about the futile attempts to find Alice.

¶56 To the extent Hummel challenges the use of his federal wire fraud convictions in his sentencing, we addressed this issue above. Finally, Hummel argues the trial

court erroneously denied his *Knapstad* motion. *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986). He makes no argument, however, as to why it was error for the trial court to deny the motion, and we decline to consider it.

¶57 Reversed and remanded for further proceedings.

Appelwick and Schindler, JJ., concur.

Review denied at 176 W.2d 1023 (2013).