IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32514-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN CAMERON IRA YOUNG, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — John Young appeals his conviction for first degree murder, arguing that he received ineffective assistance of counsel when his trial lawyer stipulated to the admission of his confession. He contends that in order to establish the corpus delecti of the crime, the State was required to present independent evidence of each of the crime's elements, and his confession was not admissible until it did. He argues that the State would not have been able to offer independent evidence of premeditation.

To establish the corpus delecti of first degree murder, the State need not present independent evidence of the mental state required for that crime. Because the State presented ample independent evidence of the fact of death and a causal connection between the death and a criminal act, the corpus delecti was established. We affirm.

FACTS AND PROCEDURAL BACKGROUND

On the morning of July 4, 2013, John Young entered the Desert Food Mart in Benton City and asked the cashier to call 911 because he had witnessed a shooting. When Lieutenant Chuck Jones of the Benton County Sheriff's Office arrived, Mr. Young, who the lieutenant described as appearing "nervous and scared," told him that "he witnessed somebody get murdered," and that the perpetrator, Joshua Hunt, was outside in the parking lot. Report of Proceedings (RP) at 129-30. Mr. Young informed Lieutenant Jones that the victim was 16-year-old Jacob S.[1] Police immediately arrested Mr. Hunt.

When Sheriff's Detective Scott Runge arrived at the Food Mart, Mr. Young repeated his claim that Mr. Hunt—his friend—had shot someone at the nearby Horn Rapids Off-Road Vehicle Park. Detective Runge would later describe Mr. Young as "excited—to the point of almost being inaudible" and Sergeant Danny McCary, who was also present for this initial contact with Mr. Young, described him as "distraught. He was crying off and on." RP at 149, 183. Together, Detective Runge, Mr. Young, and Sergeant McCary drove to the Horn Rapids Park. At this point, Mr. Young was being treated as a witness.

---

[1] "Jacob S." is a pseudonym for the juvenile victim. *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), http://www.courts.wa.gov/appellate_trial_courts/.

The park was in Richland, and the Richland Police Department was notified of a possible shooting victim. It dispatched two officers, who quickly found Jacob's body and secured the crime scene.

As the Benton County sheriff's officers proceeded to the park with Mr. Young, Detective Runge spoke to him about Jacob and the events of the night before. Mr. Young told the detective that Jacob had previously stolen two ounces of weed from Mr. Hunt and owed Mr. Hunt $70. Despite that, after Mr. Young and Mr. Hunt ran into Mr. Jacob and his girlfriend at a party the night before, the three men ended up driving to the park, where they smoked marijuana. Mr. Hunt had been carrying a handgun.

According to Mr. Young, after smoking, Jacob "got[ ] up and asked, 'Now what?' and Mr. Hunt basically pulled out the pistol and said, 'This is now what,' and began firing on him." RP at 150. Mr. Young told the officers he and Mr. Hunt later traveled to the Benton City area, where they disposed of their shoes and other evidence by placing them in a backpack that they threw into the river.

When Detective Runge explained to Mr. Young that the city of Richland had jurisdiction, Mr. Young agreed to speak with Richland detectives. Richland Police Officer Jeff Bickford drove Mr. Young from the park to the Richland police station, where Mr. Young consented to audio and video recording of an interview.

During a break in the interview, Officer Bickford learned from another Richland police officer that Mr. Hunt was telling a different story, implicating Mr. Young in the

3

murder. Upon reconvening the interview, Officer Bickford read Mr. Young *Miranda*[2] warnings and obtained his agreement that he understood he was now a suspect and any statements he made could be used against him. Mr. Young then confessed that he fired the final shot at Jacob. He claimed Mr. Hunt shot Jacob three times, then handed the gun to him, and that he then fired one shot into Jacob's head near the temple-cheek region. Mr. Young said that Jacob's body had been twitching when Mr. Young was first handed the gun, but that he stopped twitching after Mr. Young shot him in the head.[3]

Mr. Young told officers that after he and Mr. Hunt shot Jacob, they went to the Desert Food Mart (the same one from which he later called 911), bought cigarettes, drove up the road, parked, and switched out the shoes they had been wearing for ones that Mr. Hunt had in his trunk. They then put the potentially incriminating shoes, the handgun, and ammunition in a backpack, loaded the backpack with rocks to weigh it down, and dropped it in the river. Mr. Young described the shoes they had disposed of in the river as a pair of gray, neon yellow, and green Nike tennis shoes (Mr. Young's) and a pair of black Adidas (Mr. Hunt's).

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Mr. Young's videotaped interview was played for the jury but is not transcribed in the verbatim report of proceedings. A transcript of the interview prepared before trial was admitted as an illustrative exhibit but was not designated as part of the clerk's papers on appeal. We are left to rely on certain unchallenged witness testimony about what Mr. Young said in the interview. *E.g.*, Clerk's Papers at 706, 722, 729-31.

Richland police were able to locate and retrieve the backpack containing Mr. Young's and Mr. Hunt's shoes, ammunition, and Mr. Hunt's Charter Arms five-shot revolver. The shoes matched footprints and shoe patterns that had been found in the sand near Jacob's body.

The Washington State Patrol Crime Laboratory determined that all of the bullets recovered from the crime scene had been fired from the Charter Arms revolver found in the backpack. A pristine bullet found in the vicinity of the body suggested one shot had missed.

Interviews of Mr. Young's and Mr. Hunt's acquaintances yielded a witness who had heard Mr. Hunt comment in the two weeks before the murder about shooting people, including about shooting Jacob. The witness heard Mr. Young and Mr. Hunt talk about "a place to go to take [Jacob]" and the fact that Mr. Hunt had five bullets. RP at 384.

Jacob's girlfriend confirmed that the last time she had seen Jacob was in the early morning of July 4, when Mr. Hunt, Mr. Young and Jacob dropped her off at the apartment complex where she lived.

It was concluded from the autopsy performed on Jacob that he had been shot three times: he was first shot in the left mid-chest while standing, was then shot in the head while standing, and was finally shot in head while lying on the ground. Mr. Young was charged with first degree murder.

5

A first order of business when the case was called for trial was to conduct a CrR 3.5 hearing. Instead, Mr. Young's lawyer stipulated to the admission of the videotaped interview, telling the court:

> [W]e believe it's in our interests to actually stipulate to the 3.5 hearing, and I've discussed that with Mr. Young, and I know the Court will make its own inquiries, but he knows and understands he has a right to that hearing, but we believe it's in our benefit and strategic interest to proceed with the stipulation.

RP at 41-42. The court questioned Mr. Young, who stated he understood he had a right to a hearing on the admissibility of the statements but was agreeing instead that all of his statements were admissible.

During trial, Mr. Young's videotaped confession was played for the jury. At the conclusion of the evidence, the jury returned a guilty verdict. Mr. Young appeals.

## ANALYSIS

Mr. Young identifies only one issue on appeal: he contends defense counsel provided ineffective assistance of counsel by stipulating to the admission of Mr. Young's confession "when there was no independent evidence apart from his confession, under the corpus delecti rule, sufficient to establish all the elements of first degree murder." Br. of Appellant at 1. If Mr. Young is correct about the extent of independent evidence required, Mr. Young's confession would not have been admissible. "It has long been the rule in Washington that such statements [by a defendant] cannot be considered by the

6

finder of fact unless the State first establishes the corpus delecti of the crime by independent evidence." *State v. Hummel*, 165 Wn. App. 749, 758, 266 P.3d 269 (2012).

To demonstrate ineffective assistance of counsel, a defendant must show that defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and that the deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688-89, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the actions challenged. *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). If one of the two prongs of the *Strickland* test is absent, this court need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Professor LaFave has observed that

[m]ost corpus delecti cases are homicide cases, where the difficulty may be either (a) that, the victim having simply disappeared, no dead body can be produced so as to make it absolutely certain that the victim will not later turn up alive and well, or (b) that, although a dead body is found conveniently lying about, examination of the body and the surrounding circumstances reveals that the death may have been caused as well by accident, suicide or natural causes as by someone's foul play.

WAYNE R. LaFAVE, 1 SUBSTANTIVE CRIMINAL LAW § 1.4(b) at 30 (2d ed. 2003) (emphasis omitted).

7

In a homicide case, the corpus delecti generally consists of two elements: (1) the fact of death, and (2) a causal connection between the death and a criminal act. *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996); *State v. Lung*, 70 Wn.2d 365, 371, 423 P.2d 72 (1967). It can be proved by direct or circumstantial evidence, which need not be enough to support a conviction or send the case to the jury. *Aten*, 130 Wn.2d at 656. In assessing whether there is sufficient evidence of the corpus delicti independent of a defendant's statements, we assume the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State. *Id.* at 658; *City of Bremerton v. Corbett*, 106 Wn.2d 569, 571, 723 P.2d 1135 (1986).

Jacob was found dead, proving the first element. And one gunshot wound to the chest and two through the head would appear to establish the causal connection with a criminal act. If that were not enough, any possibility of self-infliction of the wounds was eliminated by the testimony of an expert pathologist that the first shot to the head would have resulted in an immediate loss of consciousness. It was also eliminated by the fact that the revolver from which the shots were fired was found miles away, in a backpack that had been weighted down and disposed of in a river.

Mr. Young nonetheless argues that our Supreme Court held in *State v. Dow*, 168 Wn.2d 243, 227 P.3d 1278 (2010), that the State "must . . . prove *every element* of the crime charged by evidence independent of the defendant's statement." Br. of Appellant at 9 (emphasis added). He attributes the asserted deficiency in the State's independent

8

evidence against Mr. Young "particularly" to the lack of independent evidence of premeditated intent. *Id.* at 7.

A defendant made the same argument in *Hummel*, relying on *Aten*, *Dow*, and *State v. Brockob*, 159 Wn.2d 311, 150 P.3d 59 (2006). But in a decision whose reasoning we endorse, Division One of our court held that Mr. Hummel "misconstrues these cases and ignores the decades of case law explaining the application of the corpus delecti rule in . . . Washington." 165 Wn. App. at 762.

The panel in *Hummel* acknowledged that the court in *Aten* had raised the mental state required to prove the second degree manslaughter charged in that case, but it pointed out that the *Aten* court did not discuss how the independent evidence did or did not establish that mental state. Instead, the court "addressed only whether the evidence supported a reasonable and logical inference that the infant died as a result of a criminal act." *Id.* at 763.

While *Dow* states that in order to establish the corpus delecti the State must prove "every element of the crime charged by evidence independent of the defendant's statement," that statement was entirely unnecessary to the court's decision. 168 Wn.2d at 254. As *Hummel* points out, the State had no evidence to prove that a crime had been committed in *Dow* apart from the defendant's statements, so discussion of the quantum of proof was dictum. 165 Wn. App. at 764.

9

Finally, *Hummel* points out that a requirement to prove every element of the crime "directly contradicts, without explicitly overruling or distinguishing, decades of Supreme Court and Court of Appeals decisions holding that proof of identity, while a necessary element to be proved at trial, need not be proved to establish the corpus delecti of the charged crime." *Id.* at 765.

For all of these reasons, we agree with *Hummel* that the State is not required to present independent evidence sufficient to demonstrate anything other than the fact of death and a causal connection between the death and a criminal act. It unquestionably demonstrated those facts in this case.

Mr. Young's claim of ineffective assistance fails for the further reason that he has not undertaken in his briefing to show in the record the absence of a legitimate strategic or tactical reason for the stipulation—this, despite the fact that Mr. Young's lawyer told the court that he and his client believed that stipulating was "in our benefit and strategic interest." RP at 42. A strategic reason is suggested by the record.

One of the detectives who participated in the interview of Mr. Young was formerly a resource officer at his high school, and she described Mr. Young at trial as someone who was "sensitive," RP at 721, and who

> doesn't like to see people suffer. He doesn't like to see people bullied. He doesn't like to see, you know, someone being beaten up.

No. 32514-8-III
*State v. Young*

RP at 720. She agreed that Mr. Young told officers that before firing the gun he "froze up" and "began tripping out"—a reaction she believed would be consistent with the personality characteristics of Mr. Young she had described. RP at 721.

In closing argument, Mr. Young's lawyer urged the jury to conclude that it was most likely Mr. Young—"sensitive," "frozen," and "tripping out"—who fired the one shot that missed. RP at 1071-72 ("John Young does not know whether he hit his target or not, if you could even really consider it a target. He doesn't know that.") It appears from his closing argument that Mr. Young's trial lawyer believed his client's videotaped interview would advance that argument. Mr. Young fails to demonstrate that his trial lawyer lacked a strategic reason for the stipulation.

Affirmed.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, C.J.

11