**FILED**
**APRIL 11, 2019**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) | No. 35863-1-III |
| | ) | |
| JOHN CAMERON IRA YOUNG, | ) | |
| | ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |
| | ) | |

PENNELL, J. — John Young seeks relief from personal restraint imposed for his 2014 Benton County jury conviction for first degree murder, committed when he was 18 years of age. The court imposed a 372-month standard-range sentence that included a consecutive 60-month firearm enhancement. Young previously appealed his conviction and this court affirmed. *State v. Young*, 196 Wn. App. 214, 382 P.3d 716 (2016), *review denied*, 187 Wn.2d 1015, 388 P.3d 482 (2017).

No. 35863-1-III
*In re Pers. Restraint of Young*

In this timely personal restraint petition (PRP) filed through counsel, Young claims (1) the prosecutor committed misconduct and denied his due process right to a fair trial by knowingly presenting false testimony from a witness, and then emphasizing that testimony in closing argument, and (2) the court abused its discretion and imposed a sentence that violated the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution by failing to consider his youth as a mitigating factor. Alternatively, Young claims his trial counsel was ineffective for failing to argue youth as a basis for a downward exceptional sentence and concurrent sentencing of the firearm enhancement. We deny Mr. Young's PRP.

FACTS AND PROCEDURE

On the morning of July 4, 2013, 16-year-old Jacob S.[1] was found dead in a remote location in Richland, with gunshot wounds to his head and chest. John Young and Joshua Hunt, both aged 18 and acquaintances of Jacob, were the last people seen with Jacob on the evening of July 3. Early the next morning, Young called 911 and reported Jacob's killing to authorities. Young said Hunt was the perpetrator. Detectives initially treated

---

[1] Jacob S. is the pseudonym for the juvenile victim that we used in the appeal opinion and use again in this petition. *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), http://www.courts.wa.gov/appellate_trial_courts/. We also use the initials G.B. for a juvenile witness whose testimony we discuss.

2

Young as a witness. In an interview videotaped by the detectives, Young gave details of

the evening's events leading up to the killing. Young initially implicated only Hunt, but

after learning from detectives that Hunt named him as a co-participant, Young eventually

confessed that he also shot Jacob. Both men were charged with Jacob's murder and tried

separately. Young stipulated to the admissibility of his videotaped police interview and it

was played to the jury.[2]

In the police interview, Young described his friendship with Hunt at the time of

the murder. Young characterized Hunt as small and weak in stature, and said he had to

defend Hunt from time to time. Young said Hunt and Jacob had been friends but Hunt

began to express hatred for Jacob in the months leading up to the murder. Hunt believed

that Jacob had stolen money and marijuana from him. Hunt also suspected Jacob was a

police informant. Two weeks prior to the murder, Hunt purchased a handgun from his

friend G.B.'s cousin. Hunt began to talk about shooting Jacob, who was also physically

larger than Hunt. Hunt and Young showed off the gun to other friends. One friend asked

why they needed a gun and Young said they would be getting rid of it soon.

---

[2] The videotaped interview was not part of the record in Young's direct appeal. A transcript had been utilized as an illustrative exhibit at trial. The State has appended that interview transcript in its response to Young's PRP. *See* Response to PRP, App. B.

3

In the early evening of July 3, 2013, Young, Hunt and G.B. were in a car near the skate park in Richland. G.B. testified that Hunt asked Young where they should take Jacob. Young said he knew a place. Hunt said he had five bullets if they wanted to take Jacob to the place Young mentioned. They talked about using a pillow to muzzle out sounds. G.B. left because he did not want to be involved. During the time Hunt was talking about killing Jacob, Young showed Hunt how to use the gun because Hunt did not know how to work the safety and trigger mechanism.

At a house party later in the evening on July 3, Young spoke with Kelly Castleberry. The two had not previously met. At trial, Castleberry testified that Young told him he was unable to join the United States Army because he was "snitched . . . out to the cops" by Jacob and had been expelled from school. 4 Report of Proceedings (RP) (Apr. 18, 2014) at 448. Young asked Castleberry about his experience with "snitches" in high school and how they were treated. Castleberry told Young he was not involved in those activities and said "'[t]hat's kind of your deal.'" *Id*. at 449. Young responded, "'Well, maybe I'll do something about it.'" *Id*.

Young told the detectives during his interview that he and Hunt then left the party and went to the area of Roberdeau Park in Richland and picked up Jacob and his girlfriend. They dropped the girlfriend off at her apartment, leaving just the three men in

the car. Jacob said he wanted to smoke methamphetamine. Hunt indicated he had some

to share, which was not true and was only a lure for Jacob. The trio went to a remote area

where they sat outside and smoked marijuana. Hunt then verbally confronted Jacob about

stealing money from him and cheating on his girlfriend. Young claimed to the detectives

that Hunt shot Jacob three times, in the chest and head, and then handed him the gun.

Young confessed that he then fired one shot into Jacob's head near the temple-cheek

region. Young said that Jacob's body had been twitching when Hunt handed him the gun,

but that Jacob stopped twitching after he (Young) shot Jacob in the head.

In the interview, Young also described his thought process before cocking the gun

and deciding to pull the trigger:

> I looked at his head and I pointed it at him. You know, I didn't do it at first.
> I didn't want to do it. But I had to man. I thought about it. You know, I
> thought about it. I couldn't do it. I couldn't just leave him there . . . not
> knowing if he was dead or alive. I couldn't just . . . do that. So I had to do
> it man. For my own sake, man. For his own sake.

Response to PRP, App. B at 117; *see also* 7 RP (Apr. 24, 2014) at 1017-19. An autopsy

confirmed Jacob sustained the final fatal shot to the head while lying on the ground.

Young did not testify at his trial.

After the jury found Young guilty of first degree murder with a firearm, the

defense requested a low-end, standard-range sentence of 250 months plus the 60-month

5

firearm enhancement, for a total sentence of 310 months. The trial court imposed the 372-month sentence recommended by the State. Additional facts will be related as pertinent to Young's claims in this PRP.

## REVIEW STANDARD

To obtain relief in a PRP, the petitioner must show actual and substantial prejudice resulting from alleged constitutional errors or, for alleged nonconstitutional errors, a fundamental defect that inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). To avoid dismissal, the PRP must be supported by facts and not merely bald or conclusory allegations. *Id.* at 813-14; *In re Pers. Restraint of Mendez Moncada*, 197 Wn. App. 601, 605, 391 P.3d 493 (2017).

## ANALYSIS

*Prosecutorial misconduct*

Mr. Young claims the prosecutor committed misconduct and violated his due process right to a fair trial by eliciting known false testimony from Kelly Castleberry regarding Young's purported motive for participating in the offense, and then emphasizing Castleberry's false testimony in closing argument to the jury.

The due process clause of the Fourteenth Amendment to the United States

Constitution imposes on prosecutors a duty not to introduce perjured testimony or use

evidence known to be false to convict a defendant. *State v. Finnegan*, 6 Wn. App. 612,

616, 495 P.2d 674 (1972). This duty requires the prosecutor to correct State witnesses

who testify falsely. *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 3 L. Ed. 2d

1217 (1959); *Finnegan*, 6 Wn. App. at 616. To succeed on his claim that the prosecutor

used false evidence to convict him, Young must show that: (1) the testimony or evidence

was actually false, (2) the prosecutor knew or should have known that the testimony was

actually false, and (3) that the false testimony was material. *United States v. Zuno–Arce*,

339 F.3d 886, 889 (9th Cir. 2003).

Kelly Castleberry gave the following direct testimony in reference to his

conversation with Young at a house party on the evening of July 3, 2013, just hours

before Jacob was murdered:

> Q. What happened after he told you that he was 18?
> A. Um, I asked him what he was doin' with his life. It's a, I guess, a normal question for anyone to ask, and he just said that he had wanted to join the Army but that a person had snitched him out to the cops and he had gotten in trouble and gotten expelled and wasn't able to join the Army.
> Q. He was expelled from school?
> A. Yeah.
> Q. And did he tell you the name of that person?

7

A. I remember [Jacob].[3]
Q. And what was your response when he told you that he was expelled from school?
A. I just said, you know, "That kind of sucks, but, I mean, when you're sellin' drugs you kind of have to expect something like that will happen."
Q. And what was his response?
A. He asked me what happened to snitches when I was in high school.
Q. And what did you say?
A. I just said, "For the most part, I didn't really get involved in that, but, you know, I was pretty sure kids got, you know, beat up at the most."
Q. And what was his response to that?
A. He was just kind of like, "Yeah, okay. That makes sense," and then he asked me if I—if he should do something about it, and I said, "That's kind of your deal. You know, I don't really know," and he had said something about, "Well, maybe I'll do something about it."

4 RP (Apr. 18, 2014) at 448-49.

In closing argument, the prosecutor stated:

So, Kelly asks about school, and the defendant says that he isn't going to school but he was expelled from school, which is also what he told Scott Runge, the detective from Benton County who drove him from the Conoco to Horn Rapids.

He had told him he was upset because it messed up Army, it messed up his sports, and he confessed his bitterness to Detective Runge about being expelled from school, but he was more specific about this prior to when [Jacob] was killed when he told Kelly Castleberry that the person that he blamed for him being expelled from school was somebody who had just arrived at the Menefee house, and that was [Jacob].

Kelly Castleberry came here and testified and identified both the defendant, who was complaining about [Jacob], and he identified [Jacob] at the party. The defendant asked Kelly Castleberry, "When you were high

---

[3] The pseudonym is inserted in place of the victim's actual first name stated in Castleberry's testimony.

school, what did you guys do to informants or snitches?" Kelly Castleberry talked, "Well, they'd get beat up," but when he heard about the time line he says, "You know, I might just let it go." And the defendant says, "No, I'm gonna do something about it."

7 RP (Apr. 24, 2014) at 990-91.  Later in closing argument the prosecutor stated:

Why did they want [Jacob] to get in the car?
        We know a couple reasons why. We know a couple of non reasons. It's not like they liked [Jacob] and wanted to hang out with him. They already had been talking that night, had been talking for weeks, months about how much they hated him because he steals stuff.  He informs.  So, it's not because they were looking at a friend they wanted to hang out with and talk.
. . . .
So, ask yourself, if they didn't want to hang out because they hate [Jacob], and if they didn't actually have the meth they told [Jacob] they could use, why did they want [Jacob] to be in the car with them after they dropped [the girlfriend] off?

*Id*. at 1002.  The defense did not object to any of the above argument.

Young contends all three *Zuno-Acre* elements are met because: (1) Castleberry's testimony that Jacob was an informant was actually and demonstrably false, (2) the prosecutor in the current case knew, or should have known, the Castleberry testimony was patently false because his office also prosecuted the 2011 juvenile matter that gave rise to Young's school expulsion, and nothing in that case record suggests Jacob was an informant, and (3) Castleberry's false testimony is material because it was the only evidence proffered by the State that tended to show Young had a personal motive for

9

murdering Jacob, and motive can be highly relevant in a homicide prosecution.
*E.g.*, *State v. Haga*, 13 Wn. App. 630, 637, 536 P.2d 648 (1975).

Addressing the first *Zuno–Arce* element, Young contends Castleberry's testimony that he (Young) blamed Jacob for his expulsion from school because Jacob "snitched" on him for dealing drugs was actually and demonstrably false. Young bases his argument on juvenile court records, appended to his PRP, that the State produced in response to Young's public records request. PRP, App. C. The records show that Young was arrested in September 2011 for delivery of a controlled substance after he and two other students were caught in a parking lot skipping school by a security officer who turned the matter over to law enforcement. Young and one of the other students involved gave statements inculpating Young. Young was then charged and pleaded guilty to delivery of a controlled substance in Benton County Juvenile Court. (*See id.* at 595-98, 635-47) He was subsequently expelled from school.

As Young points out, the 2011 records themselves give no indication that Jacob had any involvement in the matter or that Young would have had any reason to believe Jacob "snitched" on him for that incident. And the State agrees no evidence was produced in the current trial that Jacob actually was an informant. But the State distinguishes this lack of evidence from the critical point that, according to Castleberry,

10

Young told him that Jacob was an informant. Indeed, Young cannot demonstrate that

Castleberry's testimony *about what Young said to him* was actually false, even if what

Young purportedly said was based on Young's misperception that Jacob was an

informant. Castleberry did not previously know Young and there was no showing at trial

that Castleberry had any motive to testify falsely. At best for Young, Castleberry's

testimony was a matter for the jury to weigh along with other testimony by G.B. that, to

his knowledge, Hunt was the only one who suspected Jacob was an informant. *See* 3 RP

(Apr. 18, 2014) at 388-89.

In this situation, Young fails to establish the first *Zuno–Arce* element. With no

showing that Castleberry testified falsely about what Young said to him, the remaining

two *Zuno–Arce* elements are not implicated and Young's false evidence/due process

claim fails.

Nor does Young show that the prosecutor committed misconduct when discussing

the Castleberry testimony in closing argument. A defendant claiming prosecutorial

misconduct bears the burden of establishing impropriety of the prosecutor's comments

and their prejudicial effect. *See State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546

(1997). The prosecutor did not argue that Young's perception about Jacob being a police

informant was correct, or that Jacob actually was an informant. Instead, the prosecutor's

11

theme was that the murder was motivated by anger at Jacob and the perception that he was an informant. In the context of the prosecutor's argument as a whole, the statement "He informs," 7 RP (Apr. 24, 2014) at 1002, is an appropriate comment in reference to Young's own statements to Castleberry. Young otherwise points to nothing improper in the prosecutor's argument which, in any event, does not raise the specter of undue prejudice in light of Young's confession to detectives that reflected his premeditation before firing the fatal gunshot.

Young fails his burden under *Cook* on his false evidence/prosecutorial misconduct claims.

*Youth as a mitigating sentencing factor*

Relying primarily on two decisions issued after his 2014 sentencing— *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), and *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017)—Young claims he is entitled to resentencing on grounds the trial court abused its discretion by (1) failing to meaningfully consider his youth as a possible mitigating factor justifying a downward exceptional sentence, and (2) failing to consider concurrent imposition of the firearm enhancement based on youth. He contends these purported failings resulted in a sentence that is cruel and unusual punishment as applied

to juveniles under the Eighth Amendment to the United States Constitution and article I,

section 14 of the Washington Constitution. We reject Young's arguments.

The trial court may impose an exceptional sentence below the standard range if it

finds mitigating circumstances by a preponderance of the evidence. RCW 9.94A.535(1).

In *O'Dell*, the Supreme Court held that a defendant's youthfulness is a mitigating factor

that may justify an exceptional sentence below statutory sentencing guidelines, even when

the defendant is a legal adult. 183 Wn.2d at 688-89. Recently, in *In re Personal*

*Restraint of Light-Roth*, 191 Wn.2d 328, 422 P.3d 444 (2018), the Supreme Court held

*O'Dell* did not constitute a "significant change in the law" for purposes of retroactivity

analysis.[4] *Light-Roth* reasoned the *O'Dell* court had explained that *State v. Ha'mim*,

132 Wn.2d 834, 940 P.2d 633 (1997), "did not preclude a defendant from arguing

youth as a mitigating factor but, rather, it held the defendant must show that his

youthfulness relates to the commission of the crime." *Light-Roth*, 191 Wn.2d at 336.

Hence, "RCW 9.94A.535(1)(e) has always provided the opportunity to raise youth for the

purpose of requesting an exceptional sentence downward, and mitigation based on youth

---

[4] Although *Light-Roth* interpreted the concept of "significant change in the law" in the context of exemptions from the one-year time bar under RCW 10.73.090(1), its reasoning likewise applies to that phrase's usage in RAP 16.4(c)(4) for purposes of timely PRPs such as Young's.

is within the trial court's discretion." *Id.* A sentencing court abuses its discretion when the defense requests an exceptional sentence below the standard range and the court fails to consider mitigating factors raised by the defense. *O'Dell*, 183 Wn.2d at 697.

In *O'Dell*, the defendant was convicted of second degree rape, committed at the age of 18. At sentencing, defense counsel requested a downward exceptional sentence because the defendant's youthfulness impaired his ability to appreciate the wrongfulness of his conduct and act in conformity with the law. *Id*. at 685. The trial court ruled that it could not consider age as a mitigating circumstance because O'Dell was a legal adult. *Id.* On appeal, the Supreme Court held that the sentencing court abused its discretion because it believed erroneously that it could not consider youth as a mitigating factor and, as a result, failed to consider whether O'Dell's youth impacted his culpability. *Id*. at 696–97.

Here, unlike in *O'Dell*, Young did not request an exceptional sentence downward, and he made no argument at sentencing that youth was a mitigating factor that impacted his culpability. During the sentencing hearing, defense counsel cited to testimony from a trial witness, Detective Athena Clark, who knew Young from her previous role as a school resource officer at Richland High School and recalled him as a "sensitive guy" who did not like to see people get bullied or beat up. 5 RP (Apr. 22, 2014) at 720-21. Laurie Saueressig, the attendance secretary at the middle school Young attended,

14

addressed the court during sentencing. She said she got to know Young pretty well from his frequent visits to the office and recalled him having a "tender heart." 7 RP (May 2, 2014) at 1111-12. Ms. Saueressig said she always thought Young would make some mistakes but would go to junior college, get his life in order, and turn out okay. Young's counsel argued the two witnesses presented a consistent theme as to "who John Young is," and that he was not a "throw-away type person." *Id*. at 1115-16. Young's counsel then recommended a low-end, 250-month base sentence plus the 60-month firearm enhancement.

In pronouncing sentence, the trial court noted potential aggravating factors and stated it could find no mitigating factors to warrant the leniency that defense counsel requested. The court commented that it did not believe Young's capacity to understand the wrongfulness of his conduct was impaired. The court further commented that the crime was a "waste" of three young people's lives, "most importantly [Jacob's]," but the court did not sua sponte mention the concept of youth as a potential factor to mitigate Young's culpability. *Id*. at 1119. The court imposed the 312-month, standard-range base sentence and a consecutive 60-month firearm enhancement requested by the State.

In these circumstances, the court did not abuse its discretion as Young alleges because it was not asked to impose an exceptional sentence or consider youthfulness as a

mitigating factor. *See State v. Garcia–Martinez*, 88 Wn. App. 322, 329, 944 P.2d 1104

(1997) (When the trial court imposes a sentence within presumptive range and the

defendant has not alleged mitigating factors, the court cannot be said to have abused

discretion.). And under *O'Dell*, "age is not a per se mitigating factor" that automatically

entitles young defendants to an exceptional sentence downward. 183 Wn.2d at 695.

The trial court committed no sentencing error in relation to Young's age to which *O'Dell*

is material.

In *Houston-Sconiers*, our Supreme Court held that the Eighth Amendment requires

sentencing courts to consider the mitigating qualities of youth for juveniles sentenced in

adult court, and that trial courts must have discretion to impose any sentence below the

otherwise applicable SRA (Sentencing Reform Act of 1981, chapter 9.94A RCW) range

and/or sentence enhancements. *Houston-Sconiers*, 188 Wn.2d at 20-21. *Houston-

Sconiers* thus provides authority that a sentencing court has discretion to run a firearm

enhancement concurrent with the base sentence, rather than consecutively, based upon

the mitigating factor that youth diminished the defendant's culpability.

*Houston-Sconiers* was not yet issued at the time of Young's sentencing.[5]  The

prosecutor told the court at the sentencing hearing that it was mandatory to run the 60-

month firearm enhancement consecutive to the base sentence.  *See* 7 RP (May 2, 2014)

at 1099-1100, 1116-17.  *See* RCW 9.94A.533(3)(a), (e).  Young's counsel recommended

a low-end base sentence plus a consecutive firearm enhancement.  There was no further

discussion of the topic; it appears the parties and court all proceeded on the assumption

that consecutive sentencing of the enhancement was mandatory.

A trial court's incorrect understanding of applicable sentencing laws, leading to

failure to recognize it had discretion to impose a mitigated exceptional sentence, is a

fundamental defect under *Cook*.  *In re Pers. Restraint of Mulholland*, 161 Wn.2d 322,

332-33, 166 P.3d 677 (2007).  Nevertheless, whether the court's belief here about

mandatory consecutive sentencing was in fact erroneous under then-current law, or

whether *Houston-Sconiers* constitutes a significant change in the law that theoretically

---

[5] In *In re Personal Restraint of Meippen*, the Washington Supreme Court is currently considering whether the *Houston-Sconiers* holding that in sentencing juveniles in the adult criminal justice system a trial court has discretion to depart from the sentencing guidelines and mandatory sentence enhancements in light of the particular circumstances surrounding a defendant's youth, constitutes a "significant change in law" that applies retroactively.  *See* Wash. Supreme Court oral argument, *In re Pers. Restraint of Meippen*, No. 95394-5 (Nov. 15, 2018), *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.

17

could apply to Young (an adult defendant 18 years and 7 months old when he committed

the murder), neither scenario is helpful to Young. Again, he did not raise any issue of

youthfulness so as to invoke an exercise of the court's discretion in imposing the

sentencing enhancement. And he points to no such mitigating evidence in the trial court

record. Young's personal qualities observed by witnesses and referenced at the

sentencing hearing are not evidence to suggest youthfulness mitigated his culpability for

this crime.

Young's additional cited case, *State v. McFarland*, 189 Wn.2d 47, 399 P.3d

1106 (2017), is inapposite. There, the Washington Supreme Court relied on its analysis

in *Mulholland*, and held that "in a case in which standard range consecutive sentencing

for multiple firearm-related convictions 'results in a presumptive sentence that is

clearly excessive in light of the purpose of [the SRA],' a sentencing court has discretion

to impose an exceptional, mitigated sentence by imposing concurrent firearm-related

sentences." *McFarland*, 189 Wn.2d at 55 (alteration in original) (quoting RCW

9.94A.535(1)(g)). Young's case does not involve multiple convictions. And again, he

did not seek any exercise of the trial court's sentencing discretion on grounds of

youthfulness.

18

Finally, Young's reliance on *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017), *aff'd*, 192 Wn.2d 67, 428 P.3d 343 (2018), and *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017) is also misplaced. In *Bassett*, our Supreme Court affirmed the court of appeals decision and held that a provision of the *Miller*[6]-fix statute, RCW 10.95.030(3)(a)(ii), that allowed 16- and 17-year-olds to be sentenced to life without parole violated the ban on cruel punishment under article I, section 14 of the Washington Constitution. 192 Wn.2d at 91.

In *Ramos*, the juvenile defendant who committed murder crimes at age 14 received a mandatory 85-year sentence after a *Miller* resentencing hearing. Our Supreme Court rejected the notion that *Miller* applies only to literal, not de facto, life without parole sentences for juveniles. *Ramos*, 187 Wn.2d at 438-39. The *Ramos* court explained that "[h]olding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*." *Id*. The court ultimately held that Ramos received a constitutionally adequate *Miller* hearing and did not show that his sentence violated the Eighth Amendment. *Id*. at 440-53.

---

[6] *Miller v. Alabama*, 567 U.S. 460, 479, 132 S.Ct. 2455, 183 L. Ed. 2d 407 (2012) (Mandatory juvenile life without parole sentences are unconstitutional under the Eighth Amendment to the United States Constitution.).

Unlike the defendants in *Bassett* and *Ramos*, Young was no longer a juvenile when he committed his crime, did not receive a de facto life sentence, and did not allege youth was a mitigating factor at sentencing. He makes no showing that his 31-year standard-range sentence for first degree murder violates the Eighth Amendment or article I, section 14 of the state constitution.

Young provides no basis for further review of his standard-range sentence. *See Garcia–Martinez*, 88 Wn. App. at 329. He also fails his burden under *Cook* on his claims related to youth as a mitigating sentencing factor.

## Ineffective assistance of counsel

Young claims in the alternative that his counsel gave him ineffective assistance for failing to argue youthfulness was a mitigating factor to justify a downward exceptional sentence and concurrent firearm enhancement.

To establish ineffective assistance of counsel, Young must show that his attorney's performance was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012). Young must overcome the "strong presumption that counsel's performance was reasonable." *State v. Grier*,

171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Young likens his case to *State v. McGill*, 112 Wn. App. 95, 47 P.3d 173 (2002), where the court indicated a desire to impose an exceptional sentence downward, but incorrectly believed it lacked the ability to do so. On appeal, Division One of this court held that defense counsel was ineffective for failing to cite case law that would have allowed the trial court to depart from the standard range on grounds the SRA multiple-offense policy resulted in an excessive sentence. The court reasoned that "[a] trial court cannot make an informed decision if it does not know the parameters of its decision-making authority. Nor can it exercise its discretion if it is not told it has discretion to exercise." *Id*. at 102.

But unlike in *McGill* where a clear basis existed for a downward departure from the standard range, Young makes no showing from the trial court record—*and he provides no other evidence in this petition*—that youthfulness was a mitigating factor in his crime. Absent such evidence, he does not show that counsel performed unreasonably by not raising the issue and instead advocating for the low-end sentence based on personal qualities that witnesses attributed to Young. With no showing of deficient

21

performance by counsel, Young's ineffective assistance claim fails under *Strickland*. He thus also fails his burden under *Cook* on this claim.

We deny Mr. Young's PRP.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____     _____
Lawrence-Berrey, C.J.                 Korsmo, J.

22