# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83329-4-I |
| Respondent/Cross Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| KYLE RANDALL WHEELER, | |
| Appellant/Cross Respondent. | |

BIRK, J. — Kyle Wheeler appeals his conviction for second degree manslaughter. He argues (1) the State did not establish corpus delicti, (2) the State did not present sufficient evidence, (3) the trial court erred by admitting a witness's opinion testimony, (4) the trial court erred by admitting statements Wheeler made during phone calls with police, (5) the State committed prosecutorial misconduct in closing, and (6) the trial court erred by imposing witness no-contact orders. The State cross appeals the trial court's suppression of certain evidence. We agree there was error in the admission of the opinion testimony and the State committed prosecutorial misconduct, but these errors were harmless and otherwise Wheeler fails to show error. We affirm and do not reach the State's cross appeal. We remand for the trial court to address the effect of statutory amendments on Wheeler's judgment and sentence.

In light of Wheeler's corpus delicti and sufficiency arguments, we summarize the evidence at trial in the light most favorable to the State. See State

v. Hummel, 165 Wn. App. 749, 759, 266 P.3d 269 (2012); State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

Charles Hatem was staying with Randy Wheeler in Randy's studio apartment in Everett.[1] Rachael Bowker and Hatem had been in a relationship and separated, but remained on good terms. On the evening of September 8, 2018, Bowker traveled to a bar in Everett to watch a football game. When Bowker arrived, she encountered Randy, his son Kyle Wheeler, and Wheeler's girlfriend.[2] Bowker observed them become progressively more intoxicated leading up to half time. Randy suggested that Bowker visit Hatem at the apartment, which was near the bar. Wheeler offered to take his father's key card and let Bowker into the building.

On the walk to the building, Bowker observed Wheeler become angry. Wheeler said of Hatem, "I am going to tell that piece of shit to get the fuck out of my dad's house. He's going to get him fucking evicted. He needs to move his shit out. . . . That piece of shit needs to get the fuck out of my dad's house." Building security footage shows the pair at 9:42 p.m. Wheeler accompanied Bowker to the apartment. Hatem was asleep and woke when they entered. Hatem told Bowker he missed her, and came over to embrace her. At that point, Wheeler said to Hatem, "We're not here to talk about your fucking girlfriend," and, "[y]ou need to get the fuck out of my dad's apartment." Hatem said to Wheeler, "Oh, Mr. Wheeler,

---

[1] For clarity, we will refer to Randy Wheeler as "Randy." No disrespect is intended.

[2] For clarity, we refer to Kyle Wheeler as "Wheeler." No disrespect is intended.

you must be Kyle. I've heard a lot about you," to which Wheeler responded, "Shut the fuck up. Stop interrupting me. You need to get the fuck out of my dad's apartment. You're going to get him kicked out." Wheeler said to Hatem, "I'll throw your ass out this window." Bowker became frightened, and left the apartment to get Randy or Wheeler's girlfriend. When Bowker left, Wheeler was standing above Hatem, pointing in Hatem's face and yelling. Bowker did not observe any injuries on Hatem's face.

Bowker got Randy and Wheeler's girlfriend to leave the bar. She followed them out. Bowker saw the two meet Wheeler, who was coming from the direction of the apartment building. Bowker heard Wheeler say, "I told that piece of shit I was going to throw his ass out of the window. Then I had to hold him down by his neck until he calmed his ass down." Bowker watched the three walk towards the apartment, and she returned to the bar.

Between 11:00 p.m. and 2:00 a.m. that night, Jerry Ott, who lived on the floor below Randy, heard a "ruckus" that sounded like "[s]omeone falling."

Shortly before 4:52 a.m. on the morning of September 9, Michelle Gallegos discovered Hatem's body on the floor in the hallway outside Randy's apartment. Gallegos noticed a "blanket full of blood" and concluded Hatem was deceased. Gallegos called 911 shortly after 4:52 a.m. Responding police found wet blood, indicating fresh injuries.

Daniel Selove, MD, conducted an autopsy. This showed "five impacts or head and neck injuries" to Hatem's head and neck: a 5/8 inch full-thickness tear on his left upper lip; a discoloration on the right forehead above the eyebrow with

3

swelling; an area of bruising of the left scalp just above the left ear area; bruising of the undersurface of the scalp high on the right side of the head; and acute bruising to the left side of the neck with a fractured hyoid bone. Selove testified the hyoid is a "thin vulnerable bone." Selove testified a hyoid fracture can occur not only from strangulation, but "with an impact at the site, again, either by an object or a surface sufficient to cause local pressure." Selove described the possible causes of a hyoid fracture as including "blunt injuries." In Selove's opinion, the injury to Hatem's right forehead was more likely due to a kick than a punch.

The cause of death was a subdural hematoma. The impacts "resulted in this accumulation of blood within the skull or on the brain surface, which led to brain death." It would have taken minutes to hours after the impacts for the subdural hematoma to form.[3] Selove testified that had Hatem been transported to a hospital shortly after the impacts occurred, there would have been a reasonable chance he may have survived.

Selove took blood samples from the subdural hematoma and from large blood vessels of the abdomen and pelvis. The blood alcohol concentration of the subdural hematoma was .242, and the blood alcohol concentration of the body was .235. Selove concluded from the similarity that the bleeding on the brain surface was "an ongoing condition, an acute evolving accumulation of blood on his brain surface, that was leading him to die." Selove concluded the manner of death

---

[3] Selove testified the time of death was "within hours" before his temperature measurement at 8:00 a.m. on September 9, 2018, but "not 10 or 20 hours."

4

was homicide, because another person was likely involved in the accumulation of Hatem's injuries. Selove could not exclude the possibility that a fall caused "part of the totality of injuries."[4]

Selove concluded Hatem's body showed pulmonary edema. Selove described this as "an abnormal accumulation of fluid in the airways in the lungs." It occurs "over minutes or hours leading to death." "[A] foam, usually a white bubbly foam, maybe pink-tinge foam from the mouth may be observed in the person who is not yet dead but dying."

In the days following, Wheeler spoke to several people about the night's events. Anthony Verhey testified Wheeler told him that "he was evicting a guy that had been staying with his father, and the gentleman didn't want to leave, so he beat him and left him in the hallway. Gave him a blanket." Wheeler said, "he punched him" and later, "he knocked him out." Wheeler said "last he saw him he was breathing," and "he checked for a pulse[,] and [Hatem] had one."

Benjamin Scott testified Wheeler said he had punched a guy a couple of times, and that he had passed away.

Deanna Buffon testified Wheeler said he struck Hatem with an open-hand smack on the face, and put him in the hallway with a blanket. Buffon said when

---

[4] Wheeler's challenge requires the court to view the evidence in the light most favorable to the State. Wheeler called Dr. Carl Wigren as an expert witness. Wigren opined the manner of death was best labeled as "undetermined" because he could not say whether a fall or something inflicted by another person caused the subdural hemorrhage. Wingren believed the subdural hematoma happened between 4:00 and 5:00 a.m.

Wheeler and Randy checked on Hatem, there was foam at his mouth. They checked for a pulse and found he was still alive, so they left him there.

Dave McCracken testified Wheeler said he had gotten into a heated argument with an older man who was drunk. Wheeler told McCracken he hit the guy three or four times, and "must have knocked the guy down because he said he went to check on him, and the guy was foaming at the mouth. And he covered him up with a blanket I think." McCracken testified, "[H]e told me: I beat the F-ing crap out of him."

On November 7, 2018, detective Steve Brenneman called Wheeler and told him he would be filing charges. According to Brenneman, Wheeler said, " 'I'm being charged because some guy was puking and shitting in the hallway, and I turned his head to check on him." Wheeler called Brenneman back and said, "I can't believe you are charging me. He was a piece of shit that died in his own puke."

The jury found Wheeler not guilty of first degree manslaughter, but guilty of second degree manslaughter.

I

We review the record for a showing of corpus delicti de novo. State v. Green, 182 Wn. App. 133, 143, 328 P.3d 988 (2014). To establish corpus delicti in a homicide case, the State must show, through evidence independent of a defendant's incriminating statements, (1) the fact of death, and (2) a causal connection between the death and a criminal act. State v. Aten, 130 Wn.2d 640, 655-56, 927 P.2d 210 (1996). "[M]ens rea is not required to satisfy corpus delicti."

6

State v. Cardenas-Flores, 189 Wn.2d 243, 263-64, 401 P.3d 19 (2017). "[C]orroborating evidence need 'only tend to show the "major" or "essential" harm involved in the offense charged.' " Id. at 264 n.9 (quoting 1 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 146, at 810 (7th ed. 2013)). On review, "this court 'assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State.' " Hummel, 165 Wn. App. at 759 (quoting State v. Aten, 130 Wn.2d 640, 658, 927 P.2d 210 (1996)). "[T]he corpus delicti is satisfied where the totality of the independent evidence supports a reasonable and logical inference that there was a death and a causal connection between the death and a criminal act." Id. at 769-770.

Wheeler emphasizes State v. Brockob, 159 Wn.2d 311, 334-35, 150 P.3d 59 (2006), and particularly one of three companion cases in that decision concerning defendant Cobabe. While in custody Cobabe told authorities he had taken Whitlock's compact disc/digital video disc player to compel Whitlock to find him so that he could require Whitlock to supply him with drugs, id. at 325, and some evidence supported the inference Cobabe had sought to force Whitlock to find him. Id. at 334. However, "other evidence was presented supporting the inference that Cobabe had Whitlock's permission to take the player." Id. The court described Aten as standing for the proposition "if the independent evidence supports hypotheses of both guilt and innocence, it is insufficient to corroborate a defendant's admission of guilt." Brockob, 159 Wn.2d at 334-35 (citing Aten, 130 Wn.2d at 660). In describing Cobabe's case, the court said that "the totality of the independent evidence" in Aten "did *not* lead to a reasonable and logical inference

that the infant died as a result of criminal action," Brockob, 159 Wn.2d at 335 (emphasis added), and in Cobabe's case, "the facts *suggested an innocent hypothesis*," id. (emphasis added). Both cases go further than merely acknowledging the possibility of differing inferences. In one, evidence did *not* support an inference of criminality, and in the other, evidence *did* suggest innocence.

Focusing on language from Aten, Wheeler implies the independent evidence must exclude a hypothesis of innocence. This court rejected a nearly identical argument in Hummel, in which the defendant had argued based on Aten the independent evidence needed to " 'prove[ ] the nonexistence of any reasonable hypothesis of innocence.' " 165 Wn. App. at 766. Wheeler points to a later Supreme Court decision again quoting Aten for the proposition that "The independent evidence 'must be consistent with guilt and inconsistent with a[ ] hypothesis of innocence.' " Cardenas-Flores, 189 Wn.2d at 264 (alteration in original) (quoting Brockob, 159 Wn.2d at 329). But that case also said, "the independent evidence need not be of such a character that would establish the corpus delicti beyond a reasonable doubt *or even by a preponderance of the proof*." Id. (emphasis added). This is consistent with Hummel, which explained after a lengthy discussion of Aten, Brockob, and the authorities on which they relied, "where the independent circumstantial evidence is sufficient to convince reasonable minds of the fact of death and of the causal connection between the death and a criminal act, the corpus delicti is satisfied and the accused's statements are admissible." Hummel, 165 Wn. App. at 768.

Bowker observed Hatem uninjured at approximately 10:00 p.m. on September 8, 2018, with Wheeler threatening him. Hatem was found at approximately 5:00 a.m. with fresh blood on his face, a bloodied blanket nearby, and forensic evidence of five discrete injuries to his head and neck. His injuries were consistent with having suffered a beating, and were identified by expert testimony as the cause of Hatem's death. This evidence independent of Wheeler's statements supports a reasonable and logical inference that Hatem's death was due to a criminal act, and as a result, the corpus delicti rule is satisfied.

II

This court reviews the sufficiency of the evidence de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). We review the record to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Green, 94 Wn.2d at 221 (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). The reviewing court defers to the trier of fact for credibility determinations and to resolve conflicting testimony. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990), abrogated on other grounds by State v. Crossguns, 199 Wn.2d 282, 505 P.3d 529 (2022).

Wheeler argues the State did not present sufficient evidence of criminal negligence, that beyond a reasonable doubt "Wheeler, considering his intoxicated state, should have known that his conduct created a substantial risk of Hatem's

death and that his failure to be aware constituted a gross deviation from the standard of care that a reasonable person would exercise in the same situation."

The State presented evidence sufficient to show every element of second degree manslaughter, including criminal negligence. The State persuasively argues no expert testimony is required to make the connection that a beating consisting of sharp blows to the head and neck poses a substantial risk of death. The State introduced evidence that Wheeler beat Hatem, who received five blows to the head and neck, Wheeler left him unconscious, observed him foaming at the mouth, was concerned enough about Hatem's well-being to check for a pulse to determine if he was still alive, and left him in the hallway. This evidence permitted the jury to find criminal negligence. The trial court submitted the issue of voluntary intoxication to the jury with appropriate instructions, and the verdict indicates the State established the requisite level of intent. Wheeler contends jury instruction 17 established a "reasonable intoxicated person" standard of care for this case, and the State was required to submit evidence Wheeler deviated from the standard of care a reasonable intoxicated person would have exercised. However, jury instruction 17 did not replace the criminal negligence standard in instruction 11. Jury instruction 17 allowed the jury to consider evidence of intoxication "in determining whether the defendant acted with recklessness or negligence." Viewing the evidence in the light most favorable to the State, the evidence allowed the jury to conclude Wheeler acted with criminal negligence despite evidence he also was intoxicated.

III

Wheeler argues opinion testimony was improperly admitted when Officer John Dorscher testified that Hatem did not appear to have fallen. Wheeler objected, but the court did not exclude the statements at issue, in the following sequence of questions and answers:

Q. All right. What observations, if any, did you make of this male?
A. So, he didn't appear to have fallen or anything based on what I have—
  [Defense]: Objection. Speculation.
  THE COURT: Overruled.
Q. You can continue.
A. Based on various calls I have gone to and different—
  [Defense]: I am going to object again. He's giving an opinion here. Move to strike.
  THE COURT: [Prosecutor]?
  [Prosecutor]: Your Honor, I can rephrase.
  THE COURT: All right. Rephrase please.
Q. Can you please describe for the jury how the male was laying on the ground?

This court reviews evidentiary decisions for abuse of discretion. State v. Hudlow, 182 Wn. App. 266, 281, 331 P.3d 90 (2014). An evidentiary ruling constitutes an abuse of discretion " 'only when no reasonable person would take the view adopted by the trial court.' " State v. Ellis, 136 Wn.2d 498, 504, 963 P.2d 843 (1998) (quoting State v. Castellanos, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997)).

Wheeler argues this testimony was speculation and improper opinion, and that the trial court erred when it failed to sustain his objection. Wheeler argues, under ER 602 and ER 703, Officer Dorscher lacked personal knowledge of how Hatem wound up on the floor, and the State did not lay proper foundation to show Officer Dorscher was "an expert on whether someone has fallen down."

We agree that the record does not contain a sufficient foundation for Officer Dorscher to express the view that Hatem did not appear to have fallen. But we conclude that any error in the failure to strike this comment does not require reversal. Under the nonconstitutional harmless error standard, erroneously admitting evidence does not warrant retrial unless there is a reasonable probability the verdict would have been different if it had not been admitted. State v. Barry, 183 Wn.2d 297, 303, 352 P.3d 161 (2015). There is no such probability here. This testimony was not referenced again by any party. While the defense later moved for a mistrial, it did not do so on the basis of this testimony. This supports the conclusion that the testimony in context did not affect the proceedings.

IV

On the morning of September 9, 2018, while investigating Hatem's body in the hallway, police made a warrantless entry into Randy's apartment. They found Wheeler inside. Before trial, the court ruled the entry was unlawful and suppressed physical evidence collected from the apartment, Wheeler's person, and Wheeler's statements to law enforcement on September 9, 2018. Under the attenuation doctrine, the court did not suppress Wheeler's November 2018 telephonic statements to Detective Brenneman. Wheeler argues these telephonic statements should have been suppressed.

The Washington attenuation doctrine is satisfied when "an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence." State v. Mayfield, 192 Wn.2d 871, 898, 434 P.3d 58 (2019). While strict, "the purpose of our state exclusionary rule

is to protect individual privacy rights, not to permanently immunize suspects from investigation and prosecution." Id. at 896. A defendant's confession is sufficiently attenuated from an unconstitutional interrogation when they return to the police station of their own free will several days later. See Wong Sun v. United States, 371 U.S. 471, 491, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

From the record before this court, intervening between the September 9, 2018 entry into the apartment and Wheeler's November statements were, at least, Wheeler's questioning by officers at the scene, Wheeler's transport and voluntary statements in custody, Miranda warnings,[5] his speaking with an attorney, his visits with and statements to Verhey, Scott, Buffon, and McCracken, Detective Brenneman's phone call to him about arranging for his voluntary surrender, two months of time, and, for the latter set of statements to Detective Brenneman, Wheeler's return phone call to Detective Brenneman. The record does not support that the illegal entry was a proximate cause of Wheeler's November 2018 statements, and even if it were, the statements were the result of new voluntary acts of free will. Intervening events sufficiently attenuated Wheeler's November telephonic statements from the illegal search on September 9, 2018.

V

During the State's closing argument, the prosecutor argued, "Anyone who has sat at the death side—bedside of a loved one and sees them expire will often see that foam come out of their mouth." The defense objected on the basis of

---

[5] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

appealing to the passion and prejudice of the jury, and the court overruled the objection. Wheeler argues this was prosecutorial misconduct. We agree.

"Statements that do no more than appeal to the passion or prejudice of the jury are improper." State v. Whitaker, 6 Wn. App. 2d 1, 16, 429 P.3d 512 (2018), aff'd, 195 Wn.2d 333, 459 P.3d 1074 (2020). An appeal to the jury's "passion and prejudice" through use of "inflammatory rhetoric" is improper. State v. Teas, 10 Wn. App. 2d 111, 126, 447 P.3d 606 (2019). In Whitaker, we held the prosecutor committed misconduct when the prosecutor's "statements were not relevant to the elements of the crime in deciding [the defendant's] guilt and served only to appeal to the jury's sympathy by asking the jurors to put themselves in [the victim's] shoes." 6 Wn. App. 2d at 19.

"Trial court rulings based on allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard." State v. Finch, 137 Wn.2d 792, 839, 975 P.2d 967 (1999). If the defendant objected, as Wheeler did, this court evaluates (1) whether the prosecutor's comments were improper and (2) whether a substantial likelihood exists that the improper statements affected the jury's verdict. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). "The defendant bears the burden of showing both prongs of prosecutorial misconduct." Id. This court reviews a challenged statement in the context of the entire case. State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

The prosecutor's comments were improper. Inviting the jury's consideration of sitting beside a dying loved one had no relation to establishing the elements of the charged crimes and Wheeler's guilt. The argument can have served only to

14

invite a feeling of sympathy for Hatem. And while that is an entirely human emotion for this tragic case, it is not an argument supporting Wheeler's criminal liability for causing Hatem's death. The prosecutor's words constituted an inappropriate appeal to passion. We nevertheless cannot conclude there is a substantial likelihood this remark affected the verdict. The jury's unanimous vote to acquit on first degree manslaughter indicates the jury was not acting on the suggested emotionalism, and ample evidence supported the jury's guilty verdict on second degree manslaughter.

VI

The court imposed no-contact orders prohibiting Wheeler from contacting McCracken, Bowker, and all the State's witnesses. Wheeler argues the trial court lacked statutory authority to impose these orders. This is a question of law reviewed de novo. State v. Murray, 118 Wn. App. 518, 521, 77 P.3d 1188 (2003).

RCW 9A.46.080 provides "If a defendant is found guilty of a crime of harassment and a condition of the sentence restricts the defendant's ability to have contact with the victim *or witnesses*, the condition shall be recorded and a written certified copy of that order shall be provided to the victim or witnesses by the clerk of the court." (Emphasis added.) RCW 9A.46.060 is a nonexclusive list of qualifying crimes of harassment. Wheeler points out it omits homicide crimes, arguing this is because in such cases there is no need to guard against future harassment by the defendant. Despite this, Wheeler's crime does bear similarity to certain listed harassment crimes. The State acknowledged Wheeler did not intend to cause Hatem's death, but the evidence showed Wheeler intended to

influence Hatem to quit Randy's apartment through physical violence. This resembles listed harassment crimes including assault, reckless endangerment, and extortion. RCW 9A.46.060. This court has found that third degree assault, also established by showing criminal negligence, can be a crime of harassment under RCW 9A.44.060. State v. Joseph, 3 Wn. App. 2d 365, 373-74, 416 P.3d 738 (2018). We conclude the circumstances of Wheeler's offense were similar enough to listed harassment crimes to justify the no-contact orders.

VII

In a supplemental brief submitted after argument, Wheeler points to three statutory amendments that took effect after he filed his opening brief affecting the victim penalty assessment, supervision fees, and interest on restitution, all imposed as part of his judgment and sentence. Wheeler asserts that the victim penalty assessment and supervision fees must be stricken, and that remand is required for the trial court to re-assess interest on restitution. We allowed Wheeler's brief, and authorized the State to file a brief in response.[6] The State disputes that Wheeler is entitled to have the victim penalty assessment stricken, but asserts he may raise the same issue in a motion in the trial court, concedes

---

[6] The court's order authorizing a response by the State permitted the State to file a brief not exceeding 2,500 words. Without seeking leave of court, the State disregarded the court's order and filed a brief of 4,849 words, nearly twice the length the court allowed. The State's brief is unnecessarily elaborative, and at times verging on disrespectful (characterizing Wheeler as "inventing new theories of error premised on the trial court's fictional power to foretell the future overriding the clear mandates of the law in effect at the time."). The State lacked any need to exceed 2,500 words in violation of the court's order. In the interest of justice we have nevertheless considered the State's arguments. We caution that disregard of the court's orders is grounds for sanctions.

16

the supervision fees were the result of a scrivener's error, and asserts that Wheeler has waived or otherwise cannot now contest interest on restitution.

A

As this court explained in State v. Ellis, in 2023 Engrossed Substitute House Bill 1169 made amendments effective July 1, 2023, that prohibit courts from imposing the victim penalty assessment on defendants defined as indigent under RCW 10.01.160(3), and require courts to waive any victim penalty assessment imposed before July 1, 2023, on the offender's motion if the offender is indigent. See ___ Wn. App. 2d ___, 530 P.3d 1048, 1057 (2023) (citing LAWS OF 2023, ch. 449, § 1). In Ellis, this court applied these amendments as a prospective application of them to a case on direct review. Id. (citing State v. Ramirez, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)). This court applied a similar analysis in prospectively applying amendments affecting community supervision fees to a case on direct review in State v. Wemhoff, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022). Because there was no finding of indigency in Ellis and the State did not concede the issue, we remanded for a determination of indigency and reconsideration of the imposition of the victim penalty assessment. 530 P.3d at 1057-58.

The State concedes that Wheeler was previously found indigent. Nevertheless, the State argues that Wheeler is not entitled to have the victim penalty assessment stricken, but that the matter must be remanded for the trial court to determine whether Wheeler is indigent at the present time. The State points to the new provision allowing Wheeler to make a motion to establish

indigency, and invites treating his claim on appeal as such a motion for resolution by the trial court.

However, if we follow Ellis, Wheeler would be entitled to have the victim penalty assessment stricken based on the record before this court and the previous finding of indigency. For the reasons that follow, we conclude that we should follow Ellis. The State makes two arguments against our doing so. One is that Wheeler waived the issue by failing to object in the trial court. The State relies on an unpublished decision that refused to entertain a claim of sentencing error under State v. Blazina, 182 Wn.2d 827, 344 P.3d 680 (2015), in an appeal filed after the defendant had satisfied the underlying judgment and more than 14 years after it had become final. This unpublished case said nothing about waiving a claim under a later enacted statute. The State's own complaints about Wheeler's reliance on statutory amendments that became effective only after he was sentenced underscore the absurdity of arguing that Wheeler failed to preserve error by not objecting at sentencing to a victim penalty assessment that was then mandatory based on statutory changes that the legislature enacted only months later. The State's claim of waiver is meritless.

The State's more persuasive argument is that Ellis misread Ramirez. In Ramirez, a statute that became effective after the Supreme Court granted review in a case prohibited the imposition of "discretionary costs" and the "criminal filing fee" on indigent defendants. 191 Wn.2d at 739. The court discussed the potential effect of the statutory amendment as a prospective application of the new law to the case while on appeal. Id. at 748-49. The court said that a statute operates

18

prospectively when the precipitating event for its application occurs after the effective date of the statute. Id. at 749. The court said that the new amendments pertained to "costs imposed upon conviction," and because the case was "not yet final" when the amendments were enacted, they applied as a prospective application. Id. Ramirez relied on State v. Blank, 131 Wn.2d 230, 233-34, 930 P.2d 1213 (1997). Ramirez, 191 Wn.2d at 748-49. Blank concerned a statute enacted while the defendants' convictions were on appeal that shifted appellate costs. 131 Wn.2d at 234. There was a strong case that the precipitating event for that statute had not yet occurred in the defendants' cases, because their appeals were not complete. Id. at 248. But Blank did not limit its holding in this way, instead stating more broadly, "The precipitating event for application of a statute concerning attorney fees and costs of litigation is termination of the case." Id. at 249. Ramirez did not apply Blank in a manner limited to costs imposed at the termination of appeal. 191 Wn.2d at 739. And Ellis applied Ramirez to the amendment governing the victim penalty assessment. 530 P.3d at 1057.

The State says this was incorrect, because Ellis failed to appreciate that the "precipitating event" for the victim penalty assessment is different from the "precipitating event" that governed the imposition of court costs at issue in Ramirez. The State says the precipitating event for the victim penalty assessment is the conviction in the trial court, not its becoming final after appellate review. The State relies on State v. Humphrey, 139 Wn.2d 53, 983 P.2d 1118 (1999). In Humphrey, the court addressed the effect of a 1996 amendment raising the victim penalty assessment from $100 to $500. Id. at 55. The defendants had committed

19

their crimes before the amendment, but were convicted afterwards. Id. The court focused on several factors in concluding the defendants did not need to pay the higher victim penalty assessment enacted after the dates of their offenses. One was that a previous amendment to the same statute had specified it applied only to offenses committed on or after its effective date. Id. at 61-62. Another was that the amendment changed the legal consequences of the offense amounting to a new obligation for a past act. Id. at 62. And the court emphasized that the statute was phrased as applying "whenever," not "when," a person was found guilty. Id. at 58. This indicated to the court ambiguity about whether the victim penalty assessment was truly tied to the fact of conviction. Id. at 58-59. Arguing the legislature indeed meant to tie the victim penalty assessment to conviction, the State points out that in the year after Humphrey was decided the legislature again amended the statute, changing "whenever" to "when." LAWS OF 2000, ch. 71, § 3. Thus, the State says, the precipitating event for the victim penalty assessment is conviction, and that occurred in the trial court before the amendments at issue here took effect.

The State's argument is supported by the text of RCW 7.68.035(1), but it does not sufficiently take into consideration the reasoning of Ramirez and Humphrey. The trouble with the State's argument is that all of the various assessments are imposed in the judgment and sentence entered in the trial court at sentencing. This is true of the victim penalty assessment at issue here and it was true of the court costs at issue in Ramirez. It would be a purely artificial distinction to say that a defendant's liability for the court costs discussed in

20

Ramirez was precipitated only years later when appellate review terminated, but liability for the victim penalty assessment was precipitated immediately on entry of the same judgment. And the State makes too little note of Humphrey's concern with imposing an additional criminal consequence on an act after it had occurred. That concern drove its refusal to impose the higher victim penalty assessment as much as its discussion of the technically triggering event. And the State makes no effort to distinguish Wemhoff, in which this court reached the same conclusion about prospective application of amendments to a case on direct review, distinguishing the same authorities on which the State relies here. 24 Wn. App. at 201-02. We therefore agree with Ellis.

Another case in tension with Ramirez is State v. Jenks, 197 Wn.2d 708, 487 P.3d 482 (2021). In Jenks, while a defendant's case was on appeal the legislature removed second degree robbery from the list of strike offenses under the persistent offender law. Id. at 711. The court concluded the former version of the statute controlled in Jenks's case. Id. The State relies on Jenks here, but only to support its contention that "retroactive trial court error does not normally exist outside of decision-based case law." The State misunderstands the context of Jenks in two respects. First, Wheeler does not present an issue concerning "retroactive" application of law, but only prospective application to his case on direct review. Second, the court's comment in Jenks rejected authority on which the defendant had relied to the effect that new decisional law " 'can' " apply to cases pending on direct review. 197 Wn.2d at 725 (citing State v. Evans, 154 Wn.2d 438, 444, 114 P.3d 627 (2005)). The court pointed out the case concerned

new statutory amendments, not new decisional law. Id. at 725-26. But contrary to the State's argument, the court's comment did not amount to holding that new statutory amendments cannot apply to cases pending on direct review. Plainly, they can. More apt is the Jenks court's distinguishing the amendments to the persistent offender statute from Ramirez, which the court explained as holding "The triggering event was the termination of all appeals, *at which point the costs were finalized.*" 197 Wn.2d at 723 (emphasis added). Consistent with the analysis of Ellis and Wemhoff, the victim penalty assessment fits more harmoniously into Ramirez's holding governing costs.

Because the amendment prohibiting the imposition of the victim penalty assessment on a defendant indigent at the time of sentencing applies prospectively to Wheeler's case on direct review, imposition of the victim penalty assessment is impermissible. We direct that it be stricken on remand.

B

The State concedes imposition of the supervision fees was a scrivener's error. It must be stricken on remand.

C

Last, Wheeler seeks remand for the court to consider whether to impose interest on restitution. Effective January 1, 2023, the legislature added a subsection to RCW 10.82.090. Ellis, 530 P.3d at 1056 (citing LAWS OF 2022, ch. 260, § 12). Under the amended statute, the court has discretion to elect not to impose interest on restitution. RCW 10.82.090(2). The court must consider several factors, including among others the defendant's indigency and the victim's

input. Id. The State makes the same arguments against applying the statutory amendment to Wheeler's case as it made concerning the victim penalty assessment, discussed above. But because there is "no remedy presently available to the defendant" in the absence of applying the statutory amendment, the State makes no concession that remand is appropriate. Id. at 31. For the reasons explained above, we agree with Ellis and we follow it with respect to this issue also. We remand for the trial court to address whether to impose interest on the restitution amount under the factors identified in RCW 10.82.090(2).

We affirm Wheeler's conviction and the no-contact orders, and remand for proceedings consistent with this opinion.

Birk, J.

WE CONCUR:

Chung, J.

Smith, C.J.